AVETA INC., MMM Holdings, Inc., and Preferred Medicare Choice, Inc., Plaintiffs,

v.

Roberto L. BENGOA, Defendant.

C.A. No. 3598–VCL.

Court of Chancery of Delaware.

Submitted: Nov. 30, 2009.
Decided: Dec. 24, 2009.

Richard I. Horwitz, Esquire, Brian C. Ralston, Esquire, Berton W. Ashman, Esquire, Potter Anderson & Corroon, LLP, Wilmington, DE; Andrew J. Frackman, Esquire, Kenneth Murata, Esquire, Peter C. Herrick, Esquire, O'Melveny & Myers, LLP, New York City, for Plaintiffs Aveta Inc., MMM Holdings, Inc. and Preferred Medicare Choice, Inc.

Michael J. Maimone, Esquire, Joseph B. Cicero, Esquire, Gregory E. Stuhlman, Esquire, Greenberg Traurig, LLP, Wilmington, DE, for Defendant Roberto L. Bengoa.

### OPINION

LASTER, Vice Chancellor.

This opinion addresses whether defendant Roberto L. Bengoa should be held in contempt for failing to arbitrate as required by this Court's letter opinion and contemporaneously entered final order. *See Aveta Inc. v. Bengoa*, 2008 WL 5255818 (Del.Ch. Dec.11, 2008); *Aveta Inc. v. Bengoa*, C.A. No. 3598–VCL (Del. Ch. Dec. 11, 2008) (ORDER) (together, the "Merits Ruling"). Bengoa argues that I should not hold him in contempt because of substantive issues that could have been raised as affirmative defenses or counterclaims in the proceedings that led to the Merits Ruling. Applying the doctrine of res judicata, I conclude that the Merits Ruling finally resolved those issues. I reject Bengoa's other arguments and conclude that he is in contempt of the Merits Ruling.

I therefore impose sanctions on Bengoa designed to coerce compliance with the Merits Ruling and remedy the harm he caused. If Bengoa has not complied with the Merits Ruling within thirty days of this decision, then I will fine him $20,000 per day until the arbitration commences. Bengoa will bear all of the plaintiffs' attorneys' fees and expenses that were caused by his contempt, both for this proceeding and for related proceedings in the Commonwealth of Puerto Rico. In the arbitration, if the reviewing accountant determines that it needs counsel in light of the increased litigation risk resulting from Bengoa's machinations, Bengoa will bear 100% of that cost. Finally, as to a specific issue where Bengoa openly defied the Merits Ruling by refusing to arbitrate while purporting to retain his right to litigate, I hold that Bengoa has forfeited his right to dispute the calculations plaintiffs provided, and I enter judgment on that issue against Bengoa. To protect the arbitration proceeding and this Court's jurisdiction, I enjoin Bengoa, pending the entry of a final order resulting from the arbitration, from taking any action to interfere with the arbitration and from litigating any issue relating to it other than in this Court.

## I. FACTUAL BACKGROUND

The factual record begins with the facts determined by the Merits Ruling, both explicitly and implicitly. It also includes a large number of exhibits submitted with the briefing on plaintiffs' motion to enforce the Merits Ruling (the "Motion to Enforce"), on the potential renewal of a temporary restraining order that I entered against Bengoa on November 12, 2009 (the "TRO"), and in response to my ruling requiring Bengoa to show cause why he should not be held in contempt (the "Rule to Show Cause").

During a hearing on November 30, 2009, the parties agreed that I could treat the Rule to Show Cause as submitted for decision on a written record. I inquired whether there were any objections to the completeness of the record or the authen-

ticity of any document. With one exception each, the parties had none. Bengoa asked me to conduct a hearing where he could testify live if I were to consider criminal contempt sanctions. As I stated during the November 30 hearing, I consider only civil contempt. Aveta noted that it disputes whether Bengoa executed the Total Proposal, described below, when he claims. Aveta agreed that for purposes of the Rule to Show Cause, I can assume that Bengoa signed the Total Proposal when he says he did, on December 28, 2006.

In light of the parties' agreement, I am entitled to make factual findings as if after trial. I am assisted by a factual record that is largely undisputed.

## A. The Parties

Plaintiff Aveta Inc. is a health insurance company that specializes in building provider networks and management service organizations. Plaintiff MMM Holdings, Inc. is a holding company through which Aveta owns business interests in Puerto Rico. Plaintiff Preferred Medicare Choice, Inc. is a corporation organized under the laws of Puerto Rico. It operates a provider network of doctors and other health professionals.

On August 14, 2006, Aveta acquired Preferred Medicare Choice. The transaction was governed by an Agreement and Plan of Merger and Stock Purchase dated as of May 4, 2006, by and among MMM Holdings, Inc., PMC Holdings, Inc., Preferred Medicare Choice, Inc., BER Health Partners Group, Inc., and certain stockholders of Preferred Medicare Choice and BER (the "Purchase Agreement," cited as "PA"). The Purchase Agreement is the central document in the case.

Defendant Bengoa is a doctor who was a principal of Preferred Medical Choice and one of its largest shareholders. Before being acquired by Aveta, Preferred Medi-

cal Choice was privately held, and many (if not all) of Preferred Medical Choice's shareholders were doctors and other health professionals who made up its provider network. The shareholders other than Bengoa are not parties to this action, but they have played a meaningful role in it. As I will discuss below, the record convinces me that Bengoa and the other shareholders have worked together in an effort to evade the Merits Ruling.

## B. The Capital Structure Of Preferred Medical Choice And The Terms Of The Purchase Agreement

Before being acquired by Aveta, Preferred Medical Choice had two classes of shares issued and outstanding. The Class A shares were owned by BER, which in turn was owned by Bengoa and three other individuals. The Purchase Agreement refers to these four individuals as the "Principal Shareholders." Bengoa and at least one other Principal Shareholder also owned Class B shares. The remaining Class B shares were owned by over 100 individuals who did not sign the Purchase Agreement (collectively, the "Other Shareholders"). As represented in the Purchase Agreement, BER and the two Principal Shareholders who also owned Class B shares collectively owned at least 51% of the issued and outstanding capital stock of Preferred Medical Choice. I refer to the Principal Shareholders and the Other Shareholders together as the "Shareholders."

Pursuant to the Purchase Agreement, MMM purchased all of the shares of BER from the Principal Shareholders in return for 60.93% of the total "Transaction Consideration," a concept defined in the Purchase Agreement. As I will discuss in the next section, the Transaction Consideration included both cash to be paid at closing and the right to subsequent pay-

ments of "Additional Consideration," another defined term.

At the same time it acquired all of the shares of BER from the Principal Shareholders, MMM contributed to BER all of the common stock of PMC Holdings, Inc. PMC Holdings, Inc. thus became a wholly owned subsidiary of BER, which at that point was wholly owned by MMM.

MMM, BER, and the Principal Shareholders then approved the merger of PMH Holdings, Inc., with and into Preferred Medical Choice. In the merger, the Class A shares held by BER (which at that point was wholly owned by MMM) were cancelled. The Class B shares held by Other Shareholders were converted into the right to receive 39.07% of the Transaction Consideration. The shares of PMH Holdings were converted into shares of Preferred Medical Choice.

Aveta thus emerged with MMM owning 100% of BER, which in turn owned 100% of Preferred Medical Choice. The Principal Shareholders (who were the former owners of BER) emerged with a right to 60.93% of the Transaction Consideration. The Other Shareholders emerged with a right to 39.07% of the Transaction Consideration.

## C. The Calculation Of The Transaction Consideration And The Related Arbitration Mechanism

Under Section 2.1 of the Purchase Agreement, the Transaction Consideration had two components: (i) $157 million in cash to be paid at closing, plus (ii) Additional Consideration. Under Section 2.2, the Additional Consideration likewise had two components. First, subject to certain contractually designated payments and adjustments, the Shareholders would receive "fifty percent (50%) of the amount remaining on the Closing Date Balance Sheet as Net Working Capital" (the "Post–Closing

Adjustment Payment"). Second, the Shareholders could receive earn out payments for 2006 and 2007 (the "Earn Out Payments") of up to $68 million (the "Earn Out Target"), depending on how the business performed in those years.

### 1. The Earn Out Mechanism

Section 2.2(a) of the Purchase Agreement established a formula for calculating the 2006 Earn Out Payment. If Preferred Medical Choice did not achieve 2006 EBITDA exceeding $161 million, then no earn out was due for 2006. If Preferred Medical Choice achieved 2006 EBITDA of $215 million or more, then the Shareholders would receive the full Earn Out Target. If Preferred Medical Choice achieved 2006 EBITDA greater than $161 million but less than $215 million, then the Shareholders would receive a proportionate amount of the Earn Out Target. In describing the 2006 Earn Out in this fashion, I have identified the results of the formula set out in Section 2.2(a). That provision establishes the relationship mathematically by defining the 2006 Earn Out Payment (in the event 2006 EBITDA exceeds $161 million) as "an amount equal to the lesser of (y) the Earn Out Target or (z) the Earn Out Target multiplied by a fraction, the numerator of which equals the amount by which the Buyer's 2006 EBITDA exceeds one hundred sixty-one million dollars ($161,000,000) and the denominator of which is equal to fifty-four million dollars ($54,000,000)." The formula for the 2006 Earn Out Payment also provides for an alternative calculation with a reduced upper bound for 2006 EBITDA of $205 million if Preferred Medical Choice's "Closing EBITDA"—effectively its EBITDA for a defined pre-closing period—underperformed certain specified targets.

Section 2.2(b) of the Purchase Agreement established a similar formula for cal-

culating the 2007 Earn Out Payment. For 2007, the maximum payment was set at "thirty-three percent (33%) of the Earn Out Target," or approximately $22.67 million. The hurdle for receiving any payment was set at 2007 EBITDA of $230 million, and the EBITDA level at which the maximum earn out payment could be received was set at $270 million. I have again described the results of a calculation governed by a formula found in Section 2.2(b).

Earn outs frequently give rise to disputes, and prudent parties contract for mechanisms to resolve those disputes efficiently and effectively. In Sections 2.2(d) through (g), the Purchase Agreement established a mechanism for resolving disputes over the 2006 and 2007 Earn Out Payments. To ensure that there was someone representing the Shareholders with whom Aveta could negotiate and, if necessary, arbitrate, the Purchase Agreement designated Bengoa as the "Shareholders' Representative." According to Section 13.2 of the Purchase Agreement:

> [T]he Principal Shareholders and each of the other Shareholders signing this Agreement hereby irrevocably designate Roberto L. Bengoa ... as their representative, agent and attorney-in-fact (the "Shareholders' Representative") to execute any and all instruments or other documents on behalf of ... the Principal Shareholders and such other Shareholders[,] to do any and all other acts or things on behalf of ... the Shareholders which the Shareholders' Representative may deem necessary or advisable, or which may be required pursuant to this Agreement or otherwise, in connection with the consummation of the BER Sale, the Merger and the other transactions contemplated herein.

Section 13.2 gave Bengoa specific and express authority "with respect to any matter or thing required or deemed necessary by the Shareholders' Representative in connection with the provisions of this Agreement calling for the agreement of the Company, BER[,] the Principal Shareholders or other Shareholders."

Implicit in these grants of authority was Aveta's concomitant right to rely on Bengoa. And the Purchase Agreement made that right explicit. Section 13.2 provided that Aveta "shall be protected in relying on the signature of the Shareholders['] Representative as constituting the action of the Shareholders' Representative, the Company, BER and the Shareholders."

The dispute resolution provisions for the Earn Out Payments called for Aveta to work with Bengoa as Shareholders' Representative. In summary, after audited financial statements had been completed for the relevant year, Aveta was required to deliver to the Shareholders' Representative a statement of EBITDA for that year and Aveta's calculation of the Earn Out Payment for that year based on the statement. PA §§ 2.2(d) and (e). The parties then had a 20–day period to resolve any objections raised by the Shareholders' Representative. If there were no objections or if the parties reached agreement, then the result would be "final and binding." PA § 2.2(f). The Purchase Agreement provided that if the parties could not agree, then "all unresolved matters shall be resolved by Ernst & Young LLP ["E & Y"], or ... another firm of independent certified public accountants of national reputation that is mutually acceptable." PA § 2.2(g). E & Y would "resolve any matters in dispute as promptly as practicable," and its determination would be "final and binding." *Id.* Each side would pay "one-half of [E & Y's] fees and expenses." *Id.* at § 2.2(h).

## 2. The Closing Balance Sheet Mechanism

Section 2.4 of the Purchase Agreement included comparable provisions governing

the preparation of the Closing Date Balance Sheet for purposes of the Post–Closing Adjustment Payment. The dispute resolution mechanism for the Post–Closing Adjustment Payment paralleled the mechanism the Earn Out Payments. Essentially, Aveta and the Shareholders' Representative would have a 20–day period to work out any disagreements. If they could not agree, then the issue would go to E & Y for a "final and binding" determination.

### 3. The IBNR Adjustment Mechanism

In addition to the two calculations that were part of the Additional Consideration formula, Section 2.3 of the Purchase Agreement established a similar adjustment mechanism for "Closing IBNR" (the "IBNR Adjustment"). This adjustment recognized that as of the time of closing, Preferred Medical Choice reserved for claims "Incurred But Not Reported" (or "recorded" in the language of the Purchase Agreement). IBNR is an accounting concept which recognizes that there are claims outstanding as of a valuation date (here the closing date) that are anticipated liabilities and must be accounted for, even though the actual amounts of those liabilities only will be learned after the valuation date as the claims are asserted and resolved over time. In an acquisition, if the reserve turns out to be too low, then the buyer is saddled with the extra liability and paid too much for the business. If the reserve turns out to be too high, then the buyer gets a windfall and paid too little.

To address this uncertainty, the Purchase Agreement provided for Aveta and the Shareholders' Representative to work out an adjustment based on actual claims performance. The transaction closed based on the Company's estimates of its aggregate reserves for anticipated claims, called the "Statement of IBNR." After ten months, Aveta was required to deliver to the Shareholders' Representative a statement showing what actually happened, called the "Statement of Actual IBNR," plus any remaining estimates. If the Statement of Actual IBNR was greater than the Statement of IBNR, then it meant the claims were greater than anticipated and the reserve was too low. In that event, the Shareholders were required to make up the difference via a cash payment to Aveta. Conversely, if the Statement of Actual IBNR was less than the Statement of IBNR, then it meant the claims were lower than anticipated and the reserve was too high. In that event, Aveta would required to pay the excess to the Shareholders' Representative for the benefit of the Shareholders.

Section 2.3 established a dispute resolution mechanism for the IBNR Adjustment that paralleled the process the Earn Out Payments and the Post–Closing Adjustment Payment. Once again, Aveta and the Shareholders' Representative would have a 20–day period to work out any disagreements. If they could not agree, then the issue would go to E & Y for a "final and binding" determination.

### D. The Parties Disagree Over The Additional Consideration.

After closing, the parties disagreed over the Earn Out Payments, the Post–Closing Adjustment Payment, and the IBNR Adjustment. Aveta and Bengoa (in his capacity as Shareholders' Representative) explored potential resolutions. These discussions led to the other central document in the case, which Aveta calls the "Total Proposal" and Bengoa calls the "Settlement Agreement." It is entitled "Total Proposal for PMC/PHM Business and Equity Incentive Medical Management Programs," and I therefore call it the "Total Proposal." I assume for purposes of this opinion that Bengoa signed it on Decem-

ber 28, 2006, as he contends. The title for his signature line reads "Robert L. Bengoa as Shareholder's [sic] Representative."

The Total Proposal is a term sheet for resolving disputes and moving forward. It is a three-page document with six numbered items and various bullet points. Item 1 states "[s]ettlement of all current and potential claims [with respect to] PMC acquisition." Item 6 states "[s]ettlement is all or nothing; will be documented in January with formal agreements." No formal agreements were ever executed.

Despite the explicit reference to and absence of formal documentation, Bengoa has argued that the Total Proposal is a free-standing agreement that novated (in the sense of replaced and superseded) the Purchase Agreement. As I describe below, other Shareholders have advanced this same argument in litigation in Puerto Rico and before the Delaware Superior Court. I analyze this legal argument later.

For now, I note that the Total Proposal cannot be a free-standing agreement. Two items of the Total Proposal facially refer to and depend on sections of the Purchase Agreement. The first, Item 4, is entitled "Restructuring of PMC Earn Out" and contains eight subparts. Standing alone, Item 4 does not spell out any type of formula for calculating an earn out. The reference to "PMC Earn Out" necessarily relates back to the calculation of the 2006 and 2007 Earn Out Payments under Section 2.2 of the Purchase Agreement. If it did not, Item 4 would make no sense. Subparagraphs (c) and (f) of Item 4 provide different inputs for the formulas used in the Purchase Agreement to calculate the 2006 and 2007 Earn Out Payments. Subparagraph (a) sets a floor for the resulting calculations, and subparagraph (g) establishes an additional hurdle before the Shareholders receive any payment. Sub-

paragraph (b) refers to doctors being eligible for an earn out in 2006 and 2007 and all Shareholders in 2008 "based on revised formulae." Other than in the Purchase Agreement, there are no formulas. Without the Purchase Agreements, these items are meaningless.

The same is true for another section of the Total Proposal. After Item 4 comes a bulleted item that states "[n]et closing [Balance Sheet] resolved by $5.2 payment to MMM by former PMC holders by 1/31/07." The first sub-bullet states "[c]losing Balance Sheet will be finally settled on 10/30/07.... Cash payment then made either to Sellers or by them for amount on [Balance Sheet]." As with Item 4, this language makes no sense as a stand-alone provision. It necessarily relates back to the Closing Balance Sheet Adjustment contemplated by Section 2.4 of the Purchase Agreement, which provides the mechanism for determining whether the Shareholders pay out or get paid for the amount on the balance sheet as of October 30, 2007. Without that mechanism, it is impossible to determine whether a cash payment would be made "either to Sellers or by them." Standing alone, the closing balance sheet language in the Total Proposal is meaningless.

During the hearing on November 12, 2009, I questioned Bengoa's counsel regarding Bengoa's assertion that the Total Proposal was a free-standing agreement that novated the Purchase Agreement:

> The Court: .... What's your client's position as to what the discussion of the PMC earn-out under [I]tem four refers to?
>
> Counsel: Item No. 4?
>
> The Court: Yes, sir. What's that refer to?

Counsel: Preferred Medical Choice earn-out of the—I believe the purchase agreement.

The Court: .... [L]et's say, look at C, where it's talking about EBITDA for 2006 ....

Counsel: Right.

The Court: That's for the earn-out calculation, isn't it?

Counsel: Yes, Your Honor, that's what it appears to be.

\* \* \*

The Court: Tell me what the answer to the earn-out would be based solely on 4C of the [T]otal [P]roposal that your client says is a fully integrated agreement?

Counsel: We wouldn't be able to do it without—

The Court: You have to use the formula from the merger agreement, don't you?

Counsel: Yes.

The Court: And the same thing is true about the net closing balance sheet resolution bullet at the bottom of page one. That refers back to the balance sheet reconciliation procedures in the merger agreement, doesn't it?

Counsel: .... Yes, Your Honor.

I commend Bengoa's counsel for answering these questions candidly, because it is simply not possible to make a non-frivolous argument that the Total Proposal exists as a free-standing agreement, independent of the Purchase Agreement. The Total Proposal only has meaning in the context of the Purchase Agreement.

After the Total Proposal was exchanged, Aveta and Bengoa continued to discuss potential resolutions. On January 17, 2007, Bengoa proposed different terms. Bengoa continued to negotiate, and on May 11, 2007, he wrote that, "in a final effort to solve this I am willing to change my last proposal (12/2006) as follow [sic]." No formal settlement documents were ever executed.

During the negotiations, the parties implemented the contractual arbitration process. On March 27, 2007, Aveta and Bengoa executed an agreement designating E & Y to serve as arbitrator under the Purchase Agreement. Merits Ruling at *1. But after that agreement, Bengoa "refused to proceed any further with the accounting review on the basis of his claim that he [had] not been provided with the necessary materials to participate productively therein." *Id.* For nearly a year, without success, Aveta tried to satisfy Bengoa's requests and get the arbitration under way.

**E. The Lugo Delaware Action**

While Bengoa was delaying the arbitration, the Shareholders whom Bengoa represented began taking action. By letter dated June 8, 2007, a group calling itself the Advisory Committee of Former Stockholders of Preferred Medical Choice, Inc. purported to revoke Bengoa's designation as Shareholders' Representative and claimed that Bengoa had no authority to represent them. Def.'s Reply Br. On Rule to Show Cause Ex. A. Bengoa does not appear to have contested the purported revocation.

In late 2007, two Shareholders—Carlos Lugo Olivieri ("Lugo") and Antonio Marrero—disputed the calculation of the Additional Consideration. After they threatened to file suit in Puerto Rico, Aveta sought a declaratory judgment against them in the Delaware Superior Court (the "Lugo Delaware Action"). The Purchase Agreement contains a broad forum selection clause mandating that any action "arising out of or relating to" the Purchase Agreement be brought exclusively in a Delaware court:

Any Action or Proceeding arising out of or relating to this Agreement or any transaction contemplated hereby may be brought in the federal and state courts located in the State of Delaware, and each of the parties irrevocably submits to the exclusive jurisdiction of such courts in any such Action or Proceeding, waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all claims in respect of the Action or Proceeding shall be heard and determined only in such court and agrees not to bring any action or proceeding arising out of or relating to this Agreement or any transaction contemplated hereby in any other court.

PA § 13.4. Notwithstanding the filing of the Lugo Delaware Action and the forum selection clause in the Purchase Agreement, Lugo, Marrero, and two other Shareholders (Antonio Gonzalez and Victor L. Delgado Colon) filed a lawsuit on January 22, 2008, against Aveta in the Court of First Instance in the Commonwealth of Puerto Rico (the "Lugo Puerto Rico Action"). The plaintiffs in the Lugo Puerto Rico Action alleged that the Total Proposal novated the Purchase Agreement. The Puerto Rico plaintiffs sought specific performance of the Total Proposal.

Soon thereafter, in February 2008, Lugo and Marrero moved to dismiss Aveta's complaint in the Lugo Delaware Action on the grounds that the Total Proposal novated the Purchase Agreement and was the operative contract. Because the Total Proposal lacked any forum selection clause, they contended that the Superior Court could not exercise jurisdiction. The Honorable Mary M. Johnston denied the motion, ruling that "[v]iewing the facts in the light most favorable to [Aveta,] the Purchase Agreement controls and the parties have agreed that Delaware may exercise personal jurisdiction." *Aveta, Inc. v.*

*Olivieri,* 2008 WL 4147565, at *2 (Del.Super. July 28, 2008).

### F. This Court Issues The Merits Ruling.

On March 6, 2008, Aveta delivered to Bengoa a notice of intent to arbitrate. Merits Ruling at *1. On the same day, Aveta filed this action, in which it sought an order compelling Bengoa to arbitrate. On December 11, 2008, Vice Chancellor Lamb issued the Merits Ruling. He held that "the issues in dispute all focus on the correct value of the earn-out, the IBNR reconciliation, and the closing day balance sheet." Merits Ruling at *3. After describing and quoting from Sections 2.2, 2.3, and 2.4 of the Purchase Agreement, he ruled that "[t]he fundamental issues in dispute between the parties are, at least on their face, exactly those issues which [those sections] were meant to address." Merits Ruling at *3. He then ordered Aveta and Bengoa "to arbitration in accordance with the Agreement and Plan of Merger and Stock Purchase." *Aveta Inc. v. Bengoa,* C.A. No. 3598–VCL. (Del. Ch. Dec. 11, 2008) (ORDER).

Bengoa did not raise the Total Proposal in the proceedings before Vice Chancellor Lamb. He certainly could have. After all, he signed it on December 28, 2006, nearly two years before the Merits Ruling.

### G. Further Developments In The Lugo Actions

Meanwhile in Puerto Rico, the Court of First Instance was considering Aveta's motion to dismiss the Lugo Puerto Rico Action based on the forum selection clause in the Purchase Agreement. In an order dated April 6, 2009, the Court of First Instance denied the motion to dismiss, stating (in translation): "[t]o the motion to dismiss presented by defendant it is declared DENIED, because what is being

claimed is a breach of the alleged settlement contract [*i.e.*, the Total Proposal]." Cicero Aff. Ex. D (Oct. 26, 2009). It appears that the Court of First Instance was not advised of the proceeding before Vice Chancellor Lamb and did not have the opportunity to consider that the Total Proposal facially depends on the continuing vitality of the Purchase Agreement.

Aveta sought to appeal by writ of certiorari to the Court of Appeals of the Commonwealth of Puerto Rico, San Juan Judicial Division. In an opinion dated July 9, 2009, the Court of Appeals declined to review the decision, finding that it was not prudent to address the jurisdictional issue at the pleadings stage. *Oliveri v. Aveta Inc.*, KLCE09–0364 (P.R. Ct.App. July 9, 2009). It again appears that the Court of Appeals was not advised of the proceeding before Vice Chancellor Lamb and did not have the opportunity to consider the inherent dependency of the Total Proposal on the Purchase Agreement.

After the issuance of the Merits Ruling, the parties in the Lugo Delaware Action jointly moved the Superior Court on January 20, 2009, to stay that proceeding pending the anticipated E & Y arbitration. The joint motion recited that "[i]n order to determine whether the result of the arbitration in the Bengoa matter might obviate the need for (or at least narrow the scope of) these proceedings, and to conserve the resources of the parties and the Court and to preserve the *status quo* between them, the parties have stipulated and agreed that . . . this litigation should be stayed." Frackman Opp. Decl. Ex. 5 at ¶ 5 (Nov. 25, 2009). On January 21, 2009, Judge Johnston granted the joint motion. Although the Lugo Puerto Rico Action was not expressly covered by the stay, the Lugo plaintiffs made no effort to move forward in Puerto Rico.

## H. Aveta And Bengoa Respond To The Merits Ruling.

For ten months after the issuance of the Merits Ruling, Aveta attempted to proceed with the arbitration that this Court had ordered. Bengoa responded with a mix of open defiance, evasion, and obstruction.

Aveta and Bengoa had agreed in March 2007 to use E & Y as the reviewing accountants. Merits Ruling at *1. With the Merits Ruling having issued, it was simply a matter of signing up E & Y's engagement letter and moving forward. But it was not so easy. It took from December 2008 until February 2009 for Bengoa and Aveta to negotiate the terms of E & Y's engagement letter. Bengoa's initial position regarding the scope of E & Y's engagement, expressed in his counsel's email dated December 19, 2008, openly defied Vice Chancellor Lamb's order. It stated:

> The Shareholders Representative [sic] is authorized to execute the EY engagement as set forth in the revised draft attached for your review. . . .

> [T]he shareholders have decided, without waiving their rights, not to submit to EY the dispute under Section 2.2 of the stock purchase agreement concerning the 2006 and 2007 EBITDA Statements. However, the shareholders continue to believe that the Buyer has wrongfully refused to pay them the earn out. Accordingly, the shareholders' decision not to submit this issue to EY is without prejudice to the shareholders' right to the earn out which the shareholders representative expressly reserves.

Cicero Aff. Ex. 1 (Nov. 19, 2009). Bengoa thus refused to comply with the Merits Ruling compelling him to arbitrate over the Earn Out Payments, while at the same time purporting to reserve his ability to litigate those issues. For purposes of contempt, this is a smoking gun.

In response to Bengoa's refusal to submit the Earn Out Payments to arbitration, Aveta advised Bengoa that Aveta was content to have E & Y arbitrate fewer issues, but Bengoa would waive his right to contest the Earn Out Payments if they were not addressed by E & Y. This exchange began a pattern in which Bengoa's counsel raised objections and Aveta's counsel tried to accommodate them. Eventually, on February 25, 2009, the parties provided their proposed engagement letter to E & Y.

With the E & Y letter settled, the next issue was Infocrossing West, Inc., an advisory firm whom Preferred Medical Choice engaged to analyze its medical claims. Bengoa wanted to use Infocrossing in the arbitration. Aveta first resisted. Consistent with the pattern, Aveta later acceded to Bengoa's request. It was then up to Bengoa to enter into an acceptable agreement with Infocrossing. From March until June, little happened. It was only when *Aveta's* counsel prompted Bengoa and Infocrossing that the discussions progressed.

From the end of May until the beginning of August, senior Aveta representatives and Bengoa talked settlement. There was no agreement to stay the arbitration, but at the same time Aveta did not push forward. When talks broke down in August, Aveta advised Bengoa that it was initiating the E & Y arbitration.

At this point, Bengoa raised new objections to the E & Y engagement letter. Bengoa now claimed, purportedly on the advice of Puerto Rico counsel, that the arbitration must take place in Puerto Rico rather than in New York. Bengoa also refused to pay E & Y's blended rate of $520 per hour, saying it was too high. Bengoa similarly rejected the notion that each side would provide E & Y with a $25,000 retainer. These objections were made six months after agreement on E &

Y's engagement letter and in the context of a deal where the base consideration at closing was $157 million in cash.

## I. Aveta Moves To Enforce The Merits Ruling.

On September 21, 2009, Aveta filed the Motion to Enforce. Bengoa asked for an extension of time to respond, and Aveta agreed that Bengoa's responsive papers would be due on Monday, October 26. On the preceding Friday, October 23, Bengoa's father and nineteen other Shareholders filed a new action in the Court of First Instance in Puerto Rico challenging the calculation of the Additional Consideration (the "Bengoa Puerto Rico Action"). Like the Lugo Puerto Rico Action, the new complaint alleged that the Total Proposal novated the Purchase Agreement and sought to specifically enforce the Total Proposal.

The plaintiffs in the Bengoa Puerto Rico Action moved to consolidate their action with the Lugo Puerto Rico Action. Virtually simultaneously, on October 27, 2009, the plaintiffs in the Lugo Puerto Rico Action filed an amended complaint and asked the Puerto Rico court to refuse to grant Aveta any extension of time to respond. The plaintiffs in the Lugo Puerto Rico Action then made a parallel motion for consolidation of their action and the Bengoa Puerto Rico Action.

These coordinated maneuvers set up an argument that Bengoa pressed vigorously when he responded to the Motion to Enforce, namely that the to-be-consolidated Puerto Rico action was now a first-filed proceeding to which I should defer under *McWane Cast Iron Pipe Corp. v. McDowell–Wellman Engineering Co.*, 263 A.2d 281 (Del.1970). Bengoa made these arguments while conceding that "technically the [Delaware] Superior Court Action is the first-filed action of the multiple actions

discussed in the Background section of this memorandum." Def.'s Opp. to Pl.'s Motion for TRO at 12 n. 1 (Nov. 11, 2009).

Leaving aside this inconsistency, Bengoa's papers wholly ignored the fact that this litigation already had been finally resolved by the Merits Ruling. In other words, this was not a situation where similar parties were proceeding with similar cases that could force two courts to resolve the same dispute. This was a situation in which this Court already resolved the dispute nearly one year earlier. *McWane* does not speak to such a case. This is rather the province of the Full Faith and Credit Clause of the United States Constitution and the doctrines of res judicata and collateral estoppel.

Strikingly, Bengoa surfaced for the first time in responding to the Motion to Enforce the idea that the Total Proposal eliminated Bengoa's obligation to arbitrate:

On December 28, 2006—over fourteen months prior to the commencement of this action—a corporate officer of MMM and Aveta executed an agreement with Bengoa, in his capacity as Shareholders' Representative, settling the disputed issues of the Purchase Agreement (the "Settlement Agreement"). The Settlement Agreement, among other things, restructured certain provisions of the Purchase Agreement at issue in this action and at issue in the Motion. Specifically, the Settlement Agreement, among other things, restructured the "Closing Date Balance Sheet" calculation contained in Section 2.4 of the Purchase Agreement by extending the time for the consolidated company to achieve its financial goals. In sum, the Settlement Agreement made the E & Y "arbitration" process unnecessary.

Def.'s Opp. to Pl.'s Motion to Enforce Order of the Court at ¶ 9 (Oct. 26, 2009) (internal citations omitted). Bengoa thus conceded that the Total Proposal (a/k/a the "Settlement Agreement") pre-dated this action by over fourteen months, that he knew about it personally, and that he signed the document in his capacity as the Shareholders' Representative. Bengoa further conceded that if he had been successful in making his newly embraced argument to Vice Chancellor Lamb, it would have "made the E & Y 'arbitration' process unnecessary." *Id.*

Elsewhere in his papers, Bengoa explained how the Puerto Rico proceedings operate as a collateral attack on the Merits Ruling. He contended that:

The Puerto Rico litigation, which was commenced many months prior to this action, will determine whether the former stockholders of PMC have a valid and enforceable settlement agreement that novates the stock purchase agreement that underlies this action and the Motion. Such a holding by the court in Puerto Rico may moot most (if not all) of the disputes relevant to the Motion.

*Id.* at ¶ 1; *accord id.* at ¶ 18. His reply brief made similar arguments. *See* Def.'s Opp. to Pl.'s Motion for TRO at 3 (Nov. 11, 2009) (arguing that the enforceability of the Total Proposal was "squarely before the Puerto Rico trial court," which would have to determine whether the Total Proposal "modifies or novates entirely the Purchase Agreement"); *see also id.* at 4 ("[I]f the Puerto Rico trial court holds that the Settlement Agreement is enforceable and novates entirely the Purchase Agreement, and that ruling is upheld on appeal, then the claims in this action will be mooted.").

In response to these developments, Aveta moved to amend its complaint to seek declaratory relief regarding the Total Proposal and to name as defendants the plaintiffs in the Puerto Rico actions and other Shareholders. Aveta also sought a TRO

barring Bengoa and the proposed new defendants from litigating anywhere other than in this Court.

### J. The Hearing On The Motion To Enforce

On November 12, 2009, I conducted a hearing on Aveta's motion to amend its complaint, the Motion to Enforce, and Aveta's request for a TRO. I denied the motion to amend because the Merits Ruling was a final order. Believing the papers submitted by the parties made out a *prima facie* case of contempt, I issued the Rule to Show Cause. I granted a TRO to prevent Bengoa from attempting to litigate the issues before me in another jurisdiction, but declined to extend the TRO to the Shareholders now litigating in Puerto Rico. At the time, those Shareholders were not yet before me. Equally important, I was and remain mindful of the importance of comity towards courts in other jurisdictions, and I did not want to issue an order that would tread on the prerogatives and jurisdiction of my judicial colleague in Puerto Rico. I regarded the doctrine of comity as particularly relevant here because it does not appear to me that two case-dispositive arguments—the existence of this litigation and the inherent dependency of the Total Proposal on the Purchase Agreement—have ever been presented to the Puerto Rico court.

On November 30, 2009, I held a further hearing on the Rule to Show Cause. At the conclusion of the hearing, I converted the TRO into a preliminary injunction. For reasons of comity and in deference to the Puerto Rico court, I again declined to extend the injunction to the Shareholders litigating in Puerto Rico.

## II. LEGAL ANALYSIS

To be held in contempt, a party must be bound by an order, have notice of it, and nevertheless violate it. *Arbitrium v. Johnston,* 1997 WL 589030, at *3 (Del. Ch. Sept. 17, 1997). The remedy of civil contempt serves two purposes: to coerce compliance with the order being violated, and to remedy injury suffered by other parties as a result of the contumacious behavior. *Delaware State Bar Ass'n v. Alexander,* 386 A.2d 652, 665 (Del.1978). Whether a party should be held in contempt is a discretionary matter for the Court. *Dickerson v. Castle,* 1991 WL 208467, at *3 (Del.Ch. Oct. 15, 1991). The violation "must not be a mere technical one, but must constitute a failure to obey the Court in a meaningful way." *Id.* at *4 (internal quotation omitted). Even where there has been a violation, the Court will consider good faith efforts to comply with the order or to remedy the consequences of non-compliance. *Id.*

### A. Bengoa Is In Contempt Of The Merits Ruling.

Bengoa was ordered to arbitrate. He knew about the Merits Ruling and that it applied to him. It is now one year later, and the arbitration has not yet commenced. I find that the arbitration did not occur because Bengoa engaged in contumacious conduct.

First, Bengoa openly flouted his obligation to arbitrate the dispute over the Earn Out Payments. In his counsel's December 19, 2008, email, Bengoa refused to arbitrate, while purporting to preserve his ability to litigate. That was an act of contempt.

Second, Bengoa evaded and obstructed Aveta's efforts to arbitrate the other disputes. The arbitration should have commenced shortly after February 25, 2009, when Bengoa and Aveta agreed on the form of engagement letter for E & Y. But Bengoa wanted to use InfoCrossing as his advisor in the arbitration, and he refused

to proceed until he reached an agreement with them. Yet Bengoa did nothing to work out the terms of InfoCrossing's engagement. It was Aveta's counsel who sought to move things along. While Bengoa was certainly entitled to have an advisor, he was not entitled manufacture his own impediment to the arbitration.

Third, after settlement talks broke down in August 2009 and Aveta again sought to initiate the arbitration, Bengoa raised pretextual objections to E & Y's engagement. Bengoa had agreed to E & Y's engagement letter in February. Six months later, Bengoa reversed course, insisted that the arbitration take place in Puerto Rico, objected to E & Y's hourly rate, and refused to provide a $25,000 retainer. In the context of a $157 million deal, these were immaterial issues. I find that the Bengoa raised them as pretexts to avoid arbitration.

Fourth, when Aveta filed the Motion to Enforce, an all-too-convenient sequence of events transpired. Bengoa obtained a one week extension to respond to the Motion to Enforce in Delaware, during which time his father and nineteen other Shareholders just happened to file suit in Puerto Rico. At the same time, the plaintiffs in the Lugo Puerto Rico Action just happened to file an amended complaint and ask the Puerto Rico court to refuse to grant Aveta any extension of time to respond. Both sets of Shareholders just happened to file parallel motions to consolidate their proceedings. These nicely coordinated events just happened to enable Bengoa to argue in a cross motion to stay that I should defer to the Puerto Rico suits because they were first filed and moving forward.

Fifth, Bengoa had the ability as the Shareholders' Representative to bring order to this chaos. If Bengoa were truly the victim of rogue Shareholders, then Bengoa could have sought a declaratory judgment from this Court to establish his authority. In the nearly two years that Shareholders ostensibly have been disregarding Bengoa's authority, he never took this step. When asked why not, Bengoa's counsel said they never thought about it and that Bengoa has no plans to pursue such a course of action. I believe Bengoa is in fact coordinating with the other Shareholders to create problems for Aveta and avoid arbitration.

Sixth, it was Bengoa's obstructionist behavior that gave rise to this litigation in the first place. Bengoa agreed to E & Y acting as arbitrator in March 2007, over two-and-a-half years ago. Bengoa then failed to proceed with the arbitration for nearly a year, forcing Aveta to file this case. Bengoa's failure to comply with the Merits Ruling continued his prior evasion of his contractual obligations.

Finally, in response to the Rule to Show Cause, Bengoa did not make any effort to comply with the Merits Ruling. He could have opted at that point to arbitrate, in which case I would have taken into account his good faith efforts to comply. Instead he chose to advance illogical and internally inconsistent arguments which, when the flaws were pointed out by Aveta or me, his counsel was forced to retract. His counsel's candid concessions about the Total Proposal are one example. The circular conundrum he created over this Court's and E & Y's authority, discussed in the next section, is another. In still another, Bengoa argued that the doctrine of *contra preferentum* should apply to the Purchase Agreement, only to withdraw that assertion when Aveta pointed out Section 13.14 of the Purchase Agreement, which disavows the doctrine's application. Bengoa thus continued the obstructionist behavior that originally led to this litigation and later necessitated the Motion to Enforce.

Based on these factors and the totality of Bengoa's conduct, I find him in contempt.

## B. Bengoa's Arguments Do Not Exonerate Him.

Bengoa advances three main arguments to avoid a contempt finding. First, he contends that because Aveta did not seek a contempt sanction, I should not impose one. Second, he contends that by issuing the Merits Ruling, this Court divested itself of jurisdiction over this matter. Third, he argues that I should not apply the doctrine of res judicata because of the need to litigate the Total Proposal issue. I am not persuaded.

### 1. The Motion to Enforce Does Not Limit The Rule To Show Cause.

■ Bengoa first observes that Aveta only moved to enforce the Merits Ruling, did not seek a contempt finding, and only asked that any further violations of the Merits Ruling be subject to contempt. The simple answer is that I am not Aveta.

Without a doubt, Aveta has shown more patience with Bengoa than typical of an adversary. During the hearing on November 12, 2009, I asked Aveta's counsel why Aveta had not moved to enforce the Merits Ruling earlier. The answer lies in the difference between legal rights and real-world relationships. Preferred Medical Choice is a health management organization, and Bengoa and many of the Shareholders are doctors in Puerto Rico who have substantial influence with their patients. Subject to non-competition agreements that were part of the Preferred Medical Choice transaction, the doctors can take their practices elsewhere. As the owner of Preferred Medical Choice, Aveta wants to maintain good relations with the physicians who make up its provider network. Not surprisingly, Aveta strived to achieve a consensual resolution. When that failed, Aveta filed its Motion to Enforce. These relationships also explain why Bengoa has sought to avoid arbitration: in a negotiation, he has real-world leverage that he does not possess as a matter of contract.

Once the parties had briefed and argued the Motion to Enforce and Bengoa's cross-motion to dismiss or stay, it was I who issued the Rule to Show Cause. Although Aveta did not seek a finding of contempt, the parties' submissions, including Bengoa's arguments, caused me to conclude that a *prima facie* case of contempt had been presented. The scope of Aveta's Motion to Enforce does not affect my independent ability to raise the issue of contempt. By issuing the Rule to Show Cause, I gave Bengoa specific, clear, and uncontrovertible notice that I had grave concerns about his conduct. I am now ruling on the Rule to Show Cause. In doing so, I am not limited by the relief sought in the Motion to Enforce.

### 2. This Court Has Jurisdiction To Enforce The Merits Ruling.

■ Bengoa next asserts at length that I lack the power to enforce the Merits Ruling because once Vice Chancellor Lamb ordered the parties to arbitrate, this Court was deprived of jurisdiction to take further action with respect to the dispute. According to Bengoa, from that point on, only the arbitrator had power to act, and this Court's role was limited to entering any decree that the arbitrator might issue. This is incorrect.

■ Courts have inherent authority to enforce their own orders and judgments. *See Forsythe v. CIBC Employee Private Equity Fund (U.S.) I, L.P.,* 2006 WL 846007, at *2 (Del.Ch. Mar. 22, 2006) ("This court . . . retains inherent authority to enforce its decisions, even in the ab-

sence of specific authorization by rule."); *see also Cebenka v. Upjohn Co.,* 559 A.2d 1219, 1225 (Del.1989) ("[T]he Delaware Superior Court has inherent power to enforce its own orders which are issued pursuant to valid authority.") (internal quotations omitted). Without that power, litigants could ignore courts' orders and judgments with impunity.

 The legal principles that Bengoa cites address very different concerns. It is true that when parties have agreed to arbitrate an issue, a court will not address the merits of the dispute because that is the essence of the arbitrator's task. It is also true that a court will not address procedural aspects of the arbitration once it is underway, because those matters properly fall within arbitrator's authority over how to conduct to arbitration. *See, e.g., SBC Interactive, Inc. v. Corporate Media Partners,* 714 A.2d 758, 762 (Del. 1998). I fully intend to comply with those principles. But those principles do not address the power of a court to enforce an order compelling arbitration.

Bengoa's current embrace of the E & Y process would turn these principles into a catch–22 worthy of Joseph Heller. Bengoa has argued to me that he need not arbitrate because the Merits Ruling did not address E & Y's fee, retainer, or the location of the arbitration. At the same time, Bengoa has argued to me that I cannot decide those issues because the Merits Ruling divested this Court of jurisdiction. In Bengoa's world, this Court cannot decide the issues because they are for the arbitrator, but the arbitrator cannot decide them because they should have been addressed by this Court. Ironically, if Bengoa truly believed the arguments he now makes about E & Y's expansive authority, then E & Y has long possessed the power to resolve any disputes over its fees, retainer, and the location of the arbitra-

tion. The parties agreed to E & Y as an arbitrator in March 2007, twenty-two months before the Merits Ruling. Bengoa thus should have asked E & Y to decide these matters. He never did, consistent with my belief that his argument is another pretextual attempt to justify after the fact his refusal to arbitrate.

There is no mystery about the allocation of authority between E & Y and this Court. The parties to the Purchase Agreement agreed to have E & Y decide the financial and accounting issues addressed in Sections 2.2, 2.3, and 2.4 of the Purchase Agreement. This Court has the power to compel Bengoa to arbitrate and to enforce its orders.

### 3. Bengoa Cannot Rely On The Total Proposal To Avoid Enforcement Of The Merits Ruling Or A Contempt Finding.

Bengoa has argued most vigorously that the Merits Ruling cannot be enforced or Bengoa held in contempt because the Total Proposal novated the Purchase Agreement. In his reply in opposition to the Rule to Show Cause—his fourth brief in this matter—Bengoa advanced for the first time the different and more nuanced argument that the Total Proposal amended the Purchase Agreement and affected what E & Y could do in the arbitration. Both arguments are foreclosed by the doctrine of res judicata.

### a. The Merits Ruling Is Res Judicata As To Arguments Based On The Total Proposal.

 Res judicata bars a party from re-litigating the same cause of action after a judgment has been entered in a prior suit involving the same parties or their privies. Five elements are relevant in determining whether res judicata applies:

(1) the court making the prior adjudication had jurisdiction, (2) the parties in the present action are either the same parties or in privity with the parties from the prior adjudication, (3) the cause of action must be the same in both cases or the issues decided in the prior action must be the same as those raised in the present case, (4) the issues in the prior action must be decided adversely to the plaintiff's contentions in the instant case, and (5) the prior adjudication must be final.

*Bailey v. City of Wilmington,* 766 A.2d 477, 481 (Del.2001).

 Res judicata encompasses "all claims that were litigated or which *could have been litigated* in the earlier proceeding." *Hendry v. Hendry,* 2006 WL 1565254, at *8 (Del.Ch. May 26, 2006) (emphasis added); *accord Gooch v. Eaby,* 683 A.2d 59, 1996 WL 554232, at *1 (Del.1996) (TABLE) (holding that res judicata "extends to all claims which a party asserted, *or could have asserted,* in a prior proceeding between the same parties") (emphasis added). Res judicata bars a claim if (i) the "same transaction [forms] the basis for the prior and subsequent suits" and (ii) the other party "neglected or failed to assert claims which in fairness should have been asserted in the first action." *Kossol v. Ashton Condo. Ass'n,* 637 A.2d 827, 1994 WL 10861, at *2 (Del.1994) (ORDER). For res judicata to bar an unasserted claim, the underlying facts must have been known or capable of being known at the time of the first action. *LaPoint v. AmerisourceBergen Corp.,* 970 A.2d 185, 193–94 (Del.2009).

 Res judicata applies to Bengoa's newly embraced claims based on the Total Proposal. Vice Chancellor Lamb had jurisdiction over this matter. The parties are the same. The cause of action— whether Bengoa must arbitrate—is the same. The prior adjudication was final. Bengoa could have raised arguments based on the Total Proposal. He signed it in December 2006, two years before the Merits Ruling issued. While Bengoa was litigating this matter, the plaintiffs in the Lugo Delaware Action and the Lugo Puerto Rico Action were making their own novation argument. Yet Bengoa never mentioned the Total Proposal, and his current counsel could not explain why.

Given these facts, the doctrine of res judicata forecloses the argument that the Total Proposal novated the Purchase Agreement. Because the Total Proposal does not contain an arbitration provision, if Vice Chancellor Lamb had credited Bengoa's current position, it would have had case-dispositive implications. The existence and effect of the Total Proposal was an affirmative defense or compulsory counterclaim that Bengoa could and should have asserted before Vice Chancellor Lamb. Ct. Ch. R. 13(a); *Restatement (Second) of Judgments* § 22(2)(b).

Res judicata also forecloses the more subtle argument that the Total Proposal amended the terms of the arbitration provisions that Vice Chancellor Lamb enforced. The validity and scope of an arbitration provision is for this Court to decide, absent a clear delegation to the arbitrator of the power to determine the scope of the arbitral proceeding. 10 Del. C. § 5703; *James & Jackson, LLC v. Willie Gary, LLC,* 906 A.2d 76, 78–79 (Del.2006). The Merits Ruling necessarily determined whether and to what degree Bengoa must arbitrate. As the Merits Ruling shows, Vice Chancellor Lamb considered Sections 2.2, 2.3, and 2.4 of the Purchase Agreement and determined the substantive scope of the arbitration. In his words,

The fundamental issues in dispute between the parties are, at least on their

face, exactly those issues which [Sections 2.2, 2.3, and 2.4] are meant to address. It is clear to the court from the pleadings, as well as the exhibits attached to the complaint containing the lengthy correspondence between the parties, that the issues in dispute all focus on the correct value of the earn-out, the IBNR reconciliation, and the closing day balance sheet.

Merits Ruling at *3. If Bengoa had raised the Total Proposal and been successful on his amendment theory, then the Merits Ruling would have been different. In lieu of an order compelling Bengoa to arbitrate under Sections 2.2., 2.3, and 2.4, Vice Chancellor Lamb could have ordered Bengoa and Aveta to arbitrate under those sections as modified by the Total Proposal. Bengoa did not raise the Total Proposal, and res judicata bars him from raising it now.

**b. The Total Proposal Argument Fails On Its Own Merits.**

In light of Bengoa's protestations about potential injustice, I have considered independently his contention that the Total Proposal novated the Purchase Agreement, or at least amended it. His theories fail on the merits.

A novation extinguishes a prior contract and replaces it with a new agreement. It requires four elements: "(1) a valid pre-existing obligation; (2) a valid new contract; (3) extinction of the old contract; and (4) the consent of all parties to the novation transaction." *Schwartz v. Centennial Ins. Co.*, 1980 WL 77940, at *3 (Del.Ch. Jan.16, 1980). It differs from an accord and satisfaction in that it also "requires the presence of a new party" to the transaction. 13 *Corbin on Contracts* § 71 (2003).

The Purchase Agreement satisfies the first element for a novation. The signa-

tures of Aveta's officer and Bengoa in his capacity as Shareholders' Representative satisfy the fourth element. Aveta technically was not a party to the Purchase Agreement, but the signature line for the Total Proposal reads "MMM Holdings, Inc. and Aveta, Inc." I assume this would satisfy the new party requirement. Nevertheless, the Total Proposal fails as a novation under elements (2) and (3).

The Total Proposal is not a valid new contract, as required for a novation, but rather an unenforceable agreement to agree. To determine whether a contract was formed, the parties' "overt manifestation of assent—not subjective intent—controls." *Indus. Am., Inc. v. Fulton Indus., Inc.*, 285 A.2d 412, 415 (Del. 1971). The inquiry is framed as follows: "whether a reasonable negotiator in the position of one asserting the existence of a contract would have concluded, in that setting, that the agreement reached constituted agreement on all of the terms that the parties themselves regarded as essential and thus that that agreement concluded the negotiations...." *Leeds v. First Allied Connecticut Corp.*, 521 A.2d 1095, 1097 (Del.Ch.1986). A binding agreement must address the material terms of the bargain clearly and definitely. *See In re Radiology Assocs., Inc.*, 1990 WL 67839, at *2 (Del.Ch. May 16, 1990) ("An agreement cannot be enforced if, among other things, material provisions of that agreement are uncertain and indefinite."); *Most Worshipful Prince Hall Grand Lodge v. Hiram Grand Lodge Masonic Temple, Inc.*, 80 A.2d 294, 295 (Del.Ch.1951) ("It is well settled that an agreement in order to be a legally binding agreement must be reasonably definite and certain in its terms."); *see also Scarborough v. State*, 945 A.2d 1103, 1112 (Del.2008) ("As every first year law student learns, one of the central tenets of contract law is that a contract must

be reasonably definite in its terms to be enforceable.").

 A contract or term sheet will not be binding when it reflects the parties' "positive agreement" that it should not be binding until formally drawn up and executed. *Universal Products Co. v. Emerson,* 179 A. 387, 394 (Del.1935). As our Supreme Court has explained:

> There is no enforceable contract if the parties do not intend to be bound before a formal written agreement is drafted and signed. The fact that the parties intend to execute a formal agreement, however, is not dispositive. The question is whether the parties positively agree that there will be no binding contract until the formal document is executed.

*Anchor Motor Freight v. Ciabattoni,* 716 A.2d 154, 156 (Del.1998). In accordance with the objective theory of contracts, this Court looks to the plain language of the purported agreement, but may also consider other evidence, such as the parties' subsequent conduct, to determine whether or not the parties intended to be bound. *Compare BAE Sys. Info. and Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.,* 2009 WL 264088, at *4 (Del.Ch. Feb.3, 2009) (holding term sheet was binding because the party seeking to avoid it had performed for four years) *with Certainteed Corp. v. Celotex Corp.,* 2005 WL 217032, at *14 (Del.Ch. Jan.24, 2005) (holding term sheet to be a mere agreement to agree, in part because the aggrieved party sought "after long delay" to recover under a purported settlement agreement).

The Total Proposal was not a binding agreement. It was titled "Proposal," not "Agreement" or "Amendment" or anything similar. It contained provisions that left items open for further elaboration, such as "[n]eed provisions to prevent denial of care." It expressly contemplated the drafting and execution of final documents at a later date, which never occurred. The parties did not treat it as a binding agreement or amendment. Negotiations over a potential settlement continued for months after the Total Proposal was executed, and Bengoa made proposals that differed from the Total Proposal. During the proceedings before Vice Chancellor Lamb, Bengoa never once mentioned the Total Proposal, as he certainly would have if he believed at the time that the Total Proposal really was a binding agreement.

 Equally important, the Total Proposal did not extinguish the Purchase Agreement. It instead depended on the continuing vitality of the Purchase Agreement. The Total Proposal made no mention of replacing or superseding the Purchase Agreement. It rather purported to modify two of the calculations called for by the Purchase Agreement: the Earn Out Payments and the Closing Balance Sheet Adjustment. It did not replace those calculations or substitute new provisions. It principally provided different inputs for the calculations called for by the Purchase Agreement. Indeed, without the formulas in the Purchase Agreement, these aspects of the Total Proposal would be incomprehensible and meaningless. Bengoa's counsel candidly conceded this point.

Apparently realizing the futility of his novation argument, Bengoa finally conceded in his reply brief on the Rule to Show Cause—his fourth brief on the issue—that res judicata barred the argument that the Total Proposal novated the Purchase Agreement. He continued to argue that the Total Proposal amended the Purchase Agreement, an argument that is both foreclosed by res judicata and dependent on the Total Proposal operating as a valid and binding amendment. For the reasons already discussed, I find that the

Total Proposal was not an amendment. It was a non-binding agreement to agree.

Bengoa's contention that he might not be required to arbitrate because of the Total Proposal thus fails on the merits. It is foreclosed by res judicata regardless. Bengoa cannot use the Total Proposal as a basis to avoid contempt.

## C. The Appropriate Sanction

"A trial judge has broad discretion to impose sanctions for failure to abide by its orders." *Gallagher v. Long,* 940 A.2d 945, 2007 WL 3262150, at *2 (Del.2007) (TABLE). The sanctions imposed must be "just and reasonable." *Id.* As noted, sanctions for civil contempt should be directed towards coercing compliance with the order being violated and remedying the injury suffered by other parties as a result of the contumacious behavior. *Delaware State Bar Ass'n,* 386 A.2d at 665. "[I]n selecting contempt sanctions, a court is obligated to use the least possible power adequate to the end proposed." *TR Investors, LLC v. Genger,* 2009 WL 4696062, at *18 n. 74 (Del.Ch. Dec.9, 2009) (quoting Am.Jur.2d *Contempt* § 195).

As a threshold matter, I consider whether it would be adequate to do nothing more than again order Bengoa to arbitrate, as Bengoa suggests I should. I regard an order directing immediate compliance with the Merits Ruling as necessary but not sufficient. Bengoa already was ordered to arbitrate. Simply re-iterating the order is not enough. Additional coercive and remedial sanctions are warranted to ensure compliance, to remedy Bengoa's past violations, and to protect the integrity of this Court's jurisdiction.

I therefore order Bengoa to comply immediately with the Merits Ruling. The parties will proceed in accordance with the February 25, 2009 engagement letter for E & Y with the schedule it contemplates updated to reflect the new commencement date. E & Y has the authority to resolve any disputes over its engagement and the procedures for the arbitration. *See Mehiel v. Solo Cup Co.,* 2005 WL 1252348, at *7 (Del.Ch. May 13, 2005) (holding under similar arbitral mechanism that "[i]t is the parties or the arbitrator who must resolve disputes concerning the scope of [E & Y's engagement] letter"). If the arbitration does not commence within thirty days of this decision, then Bengoa will pay a fine of $20,000 per day until the arbitration commences. In the context of an over $157 million deal, this fine errs on the light side.

I next order Bengoa to bear all of the expenses, including attorneys' fees, that Aveta has incurred because of Bengoa's contempt. This sanction includes all expenses incurred by Aveta in connection with its efforts to pursue the arbitration since February 25, 2009, when Aveta and Bengoa provided their agreed-upon form of engagement letter to E & Y. The arbitration should have commenced at that point. This sanction also includes all of the expenses Aveta has incurred in this proceeding. I award the expenses for this proceeding as a sanction, recognizing that Aveta is also entitled to these amounts under Section 13.5 of the Purchase Agreement which provides for fee-shifting to a prevailing party. *See* PA § 13.5.

I further order Bengoa to pay Aveta's fees and expenses in the proceedings in Puerto Rico. If Bengoa had complied with the Merits Ruling, then E & Y would have resolved the disputed issues and this Court would have entered E & Y's award as a final judgment. The existence of a final judgment would have put a stop to the Shareholders' various efforts to claim more Additional Consideration. I already have

concluded that Bengoa has coordinated his efforts with the plaintiffs in Puerto Rico with the goal of causing problems for Aveta and this Court. The fact that Aveta is being forced to litigate in Puerto Rico flows from Bengoa's contempt. Requiring Bengoa to pay Aveta's expenses in Puerto Rico also recognizes that when faced with (allegedly) rogue Shareholders who were disregarding his authority as Shareholders' Representative, Bengoa could and should have brought a declaratory action in this Court to establish the scope of his authority. Instead, Bengoa allowed the other plaintiffs to run amok and then conspired with them to orchestrate the carefully coordinated legal filings in October 2009.

I therefore order Bengoa to bear all of Aveta's expenses for the Puerto Rico proceedings beginning on August 14, 2009. I choose that date in an exercise of discretion in light of my belief that the arbitration should have commenced shortly after February 25, 2009. The schedule in the agreed-upon engagement letter for E & Y had some give, but generally outlined a four month process. I have added an additional month to account for the schedule's flexibility and to provide time for the entry of the arbitral award as a final order.

The August 14, 2009 date also marks the point when Aveta, having become frustrated with Bengoa's lack of cooperation during summertime settlement talks, notified Bengoa that Aveta would be moving full speed ahead with the arbitration. By not requiring Bengoa to bear Aveta's fees prior to August 14, I take into account that Aveta's business decision to negotiate with Bengoa played some role in the delay after February 2009. Because Bengoa's contumacious behavior pre-dated the August date, drawing the line at August 14 is, if anything, overly generous to Bengoa.

Next, I impose on Bengoa 100% of the cost of E & Y's counsel. The Purchase Agreement provides that each party will bear one half of the cost of the arbitration. One point of debate during the negotiation of the E & Y engagement letter was whether E & Y would be advised by counsel in the arbitration, with Bengoa objecting to E & Y retaining counsel and Aveta declining to fight about it. Cicero Aff. Ex. 1 (Nov. 19, 2009). I hold that if E & Y elects to hire counsel, Bengoa will bear 100% (rather than 50%) of that cost.

Under Delaware Uniform Arbitration Act, I have the power to re-allocate the costs of the arbitration "as justice requires." 10 Del. C. § 5712. The statutory section provides, in full:

> Unless otherwise provided in the agreement to arbitrate, the arbitrators' expenses and fees, together with other expenses, not including counsel fees, incurred in the conduct of the arbitration, shall be paid as provided in the award. The Court, on complaint or on application in an existing case, may reduce or disallow any fee or expense which it finds excessive, or may allocate it as justice requires.

*Id.* The cost of E & Y's counsel falls under the "arbitrators' expenses." The phrase "not including counsel fees" refers to "other expenses" and limits fee shifting for parties except as provided in the arbitration agreement or under traditional exceptions to the American Rule.

Recognizing Delaware's strong public policy in favor of freedom of contract, I regard the power to re-allocate fees and expenses "as justice requires" as one that should be used sparingly, lest the courts upset settled expectations in bargained-for arrangements. Here, Bengoa's contumacious conduct has increased dramatically the risk of disputes and litigation for E & Y. Had Bengoa and Aveta proceeded to

arbitrate in due course, E & Y could have been comfortable proceeding without counsel. In light of the proceedings that Bengoa and his fellow Shareholders have commenced, I fully expect E & Y to want counsel to provide advice in the arbitration. Bengoa should and will bear 100% of the expense.

My remedial powers are not limited to shifting expenses. The entry of judgment is a permissible sanction, although one that only should be invoked when there is "an element of willfulness or conscious disregard of a court order." *Gallagher*, 940 A.2d 945, 2007 WL 3262150, at *2. After being ordered to arbitrate, Bengoa openly, willfully, and consciously refused to submit the dispute over the Earn Out Payments to arbitration, as the Merits Ruling required him to do, while at the same time purporting to preserve his right to litigate the issue. As a consequence for his outright defiance of the Merits Ruling, I hold that Bengoa cannot dispute the Earn Out Payments. Stated differently, I hold that Bengoa has forfeited his opportunity to contest the Statements of EBITDA and related calculations of the Earn Out Payments that Aveta provided pursuant to Sections 2.2(d) and (e). I recognize that this is the functional equivalent of entering judgment against Bengoa on the Earn Out Payments, but I find that such a remedy is warranted here given Bengoa's open and willful defiance of the Merits Ruling on this very point. The Purchase Agreement contemplated that unless the Shareholders' Representative properly objected to the statements provided by Aveta, those statements would become "final and binding." PA § 2.2(f). The remedy I impose for Bengoa's contumacious refusal to pursue the arbitration is thus consistent with the parties' agreement. Bengoa is therefore bound in his capacity as Shareholders' Representative by the calculations provided to him by Aveta pursuant to Sections 2.2(d) and (e).

Finally, I issue a preliminary injunction barring Bengoa from taking any action, directly or indirectly, independently or in concert with others, and whether by way of application to another court or otherwise, that seeks to or would have the effect of delaying or interfering with (i) the arbitration ordered by this Court in the Merits Ruling, (ii) the proceedings in this Court relating to the enforcement of the Merits Ruling, or (iii) any proceedings in this Court relating to the Purchase Agreement. Bengoa is further enjoined from litigating any matter relating to the Purchase Agreement in any other forum. *See Household Int'l, Inc. v. Eljer Indus., Inc.*, 1995 WL 405741, *3 (Del.Ch. June 19, 1995) (Allen, C.) (granting anti-suit injunction to protect Chancery jurisdiction); *see generally* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 5.03 (2009). The injunction extends to Bengoa, his agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this order. Ct. Ch. R. 65(d).

This preliminary injunction replaces the TRO entered on November 12, 2009 and the preliminary injunction entered on November 30. The injunction shall remain in effect until this Court enters a final judgment confirming an award in the arbitration or is otherwise lifted for good cause shown. Bond remains at $10,000.

## III. CONCLUSION

For the foregoing reasons, I hold that Bengoa is in contempt of the Merits Ruling and impose the sanctions that I have described. IT IS SO ORDERED.