## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

_____

|  |  |  |
|---|---|---|
| In re: TRANSPERFECT GLOBAL, INC. | ) | C.A. No. 9700-CB |

_____)

|  |  |  |
|---|---|---|
| ELIZABETH ELTING, | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | C.A. No. 10449-CB |
| | ) | |
| PHILIP R. SHAWE and SHIRLEY SHAWE, | ) | |
| Respondents, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| TRANSPERFECT GLOBAL, INC. | ) | |
| Nominal Party. | ) | |

## MEMORANDUM OPINION

Date Submitted: October 10, 2019
Date Decided: October 17, 2019

David L. Finger, FINGER & SLANINA, LLC, Wilmington, Delaware; David B. Goldstein, RABINOWITZ, BOUDIN, STANDARD, KRINSKY & LIEBERMAN, P.C., New York, New York; Alan M. Dershowitz, Cambridge, Massachusetts; *Attorneys for Philip R. Shawe.*

Frank E. Noyes, II, and Charles A. McCauley, III, OFFIT KURMAN, P.A., Wilmington, Delaware; *Attorneys for TransPerfect Global, Inc.*

Jennifer C. Voss and Elisa M.C. Klein, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; *Attorneys for Custodian Robert B. Pincus.*

Jeremy D. Eicher, EICHER LAW LLC, Wilmington, Delaware; *Attorney for Shirley Shawe.*

Kevin R. Shannon, Berton W. Ashman, Jr., Christopher N. Kelly, Jaclyn C. Levy, and Mathew A. Golden, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Philip S. Kaufman and Jared I. Heller, KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, New York; *Attorneys for Elizabeth Elting.*

**BOUCHARD, C.**

On August 26, 2019, Robert B. Pincus, in his capacity as a court-appointed custodian (the "Custodian), filed a motion for civil contempt and sanctions against TransPerfect Global, Inc. ("TransPerfect" or "TPG" or the "Company") and Philip R. Shawe ("Shawe") for violating three orders of this court. The first order, entered on February 15, 2018, approved a securities purchase agreement and related agreements whereby Shawe acquired Elizabeth Elting's 50% interest in the Company (the "Final Order"). The other two orders, entered on June 28, 2019 and July 17, 2019, granted fee petitions of the Custodian (the "Fee Orders").

For the reasons explained below, the court grants the motion for contempt and imposes sanctions with respect to the Final Order. The court will address at a later time the motion for contempt insofar as it concerns the Fee Orders.

## I.    Background[1]

The factual and procedural background of these actions is discussed in detail in numerous opinions of this court and the Delaware Supreme Court.[2] This decision

---

[1] Civil Actions Nos. 9700-CB and 10449-CB have been litigated together since their inception but were not formally consolidated. Docket citations refer to C.A. No. 9700-CB.

[2] *See In re TransPerfect Glob., Inc.*, 2018 WL 904160 (Del. Ch. Feb. 15, 2018), *aff'd sub nom. Elting v. Shawe*, 185 A.3d 694 (Del. 2018); *In re TransPerfect Glob., Inc.*, 2017 WL 3499921 (Del. Ch. Aug. 4, 2017); *In re Shawe & Elting LLC*, 2016 WL 3951339 (Del. Ch. July 20, 2016), *aff'd sub nom. Shawe v. Elting*, 157 A.3d 142 (Del. 2017); *In re TransPerfect Glob., Inc.*, 2016 WL 3477217 (Del. Ch. June 20, 2016, revised June 21, 2016); *Shawe v. Elting*, 2015 WL 5167835 (Del. Ch. Sept. 2, 2015); *Shawe & Elting LLC*, 2015 WL 4874733 (Del. Ch. Aug. 13, 2015), *aff'd sub nom. Shawe v. Elting*, 157 A.3d 152 (Del. 2017).

recites only those facts directly relevant to the contempt motion. TransPerfect and Shawe are referred to together at times as "Respondents."

## A.    Appointment of the Custodian

These actions began in May 2014 and were the subject of a six-day trial that ended on March 3, 2015. The core issue at trial was Elting's request under 8 *Del. C.* § 226 for the appointment of a custodian to sell the Company to resolve stockholder and board level deadlocks at the Company.[3]

Shortly after trial, on March 9, 2015, the court entered an order appointing Pincus as "custodian of TPG . . . for the purpose of serving as a mediator to assist Elting and Shawe in negotiating a resolution of their disputes."[4] Paragraph 7 of that order provided that the Custodian would file a petition on a monthly basis for approval of his fees and expenses and that "[a]ny fees and expenses approved by the Court shall be paid promptly by TPG."[5]

---

[3] Section 226(a) provides that "[t]he Court of Chancery, upon application of any stockholder, may appoint 1 or more persons to be custodians, and, if the corporation is insolvent, to be receivers, of and for any corporation when: (1) At any meeting held for the election of directors the stockholders are so divided that they have failed to elect successors to directors whose terms have expired . . . ; or (2) The business of the corporation is suffering or is threatened with irreparable injury because the directors are so divided respecting the management of the affairs of the corporation that the required vote for action by the board of directors cannot be obtained and the stockholders are unable to terminate this division."

[4] Dkt. 515 ¶ 1.

[5] *Id.* ¶ 7.

2

On August 13, 2015, after the parties failed to resolve their disputes through mediation with the Custodian, the court issued a post-trial opinion and implementing order (the "2015 Order"). The 2015 Order entered judgment in Elting's favor on her claims under Section 226 and appointed Pincus "as custodian of TPG . . . for the purposes set forth in the Opinion."[6] As explained in the accompanying opinion, those purposes included (i) "to oversee a judicially ordered sale of the Company" and (ii) in the interim before a sale was consummated, "to serve as a third director with the authority to vote on any matters on which Shawe and Elting cannot agree and which rise to the level that [the Custodian] deems to be significant to managing the Company's business and affairs."[7]

The 2015 Order required the Custodian to "provide a report to the Court every thirty days after entry of this Order concerning the progress of his efforts."[8] It also afforded the Custodian and his law firm judicial immunity as well as indemnification and advancement rights:

> The Custodian and the law firm of Skadden, Arps, Slate, Meagher & Flom LLP, its partners and employees (collectively, "Skadden") are

---

[6] Dkt. 607 ¶ 5.

[7] *In re Shawe & Elting LLC*, 2015 WL 4874733 at *32. With respect to the second purpose, the court cited *Bentas v. Haseotes*, 769 A.2d 70, 79 (Del. Ch. 2000). There, this court appointed a custodian under Section 226 to serve a similar role, *i.e.*, to "be present, and cast a vote, at board meetings where the board would otherwise be incapable of acting, either because the directors are equally divided on a particular proposal, or because the absence of directors threatens to defeat a quorum." *Id.* (internal citation omitted).

[8] Dkt. 607 ¶ 8.

entitled to judicial immunity and to be indemnified by TPG, in each case, to the fullest extent permitted by law. Without limiting the generality of the foregoing, fees and expenses incurred by the Custodian and Skadden in defending any civil, criminal, administrative or investigative claim, action, suit or proceeding reasonably related to the Custodian's responsibilities under this order shall be paid by TPG in advance of the final disposition of such claim, action, suit or proceeding within 15 days of a statement therefor.[9]

Additionally, the 2015 Order established procedures to compensate the Custodian and his advisors for the work they performed. Specifically, paragraphs 10 and 11 of the 2015 Order directed the Custodian to petition the court on a monthly basis for approval of his fees and expenses and the fees and expenses of advisors he retained to assist him in performing his duties, and obligated the Company to pay those fees and expenses "promptly" upon court approval:

> 10. The Custodian shall be compensated at the usual hourly rate he charges as a partner of Skadden. The Custodian also shall be reimbursed for reasonable travel and other expenses incurred in the performance of his duties. The Custodian shall petition the Court on a monthly basis, or such other interval as the Court may direct, for approval of fees and expenses. Any fees and expenses approved by the Court shall be paid promptly by TPG.

> 11. The Custodian may retain counsel (including Skadden) or other advisors to assist him in the performance of his duties under this Order. The fees of any counsel or advisors so retained shall be calculated on the same hourly rates charged by such counsel or advisors

---

[9] Dkt. 607 ¶ 9.

to clients represented outside this matter. The reasonable fees and expenses of such counsel or advisors shall be paid promptly by TPG.[10]

## B. The Director Indemnification Agreement

On August 19, 2015, the Company and Pincus (as "Indemnitee") entered into a Director Indemnification Agreement (the "DIA"). The DIA affords the Custodian certain additional rights to indemnification and advancement but only in his capacity as a director of TPG.[11] The DIA expressly provides that these rights "shall be in addition to, but not exclusive of, any other rights which Indemnitee may have at any time under applicable law, the Certificate of Incorporation or Bylaws, any other agreement, vote of members or directors . . . , or otherwise."[12]

To obtain indemnification or advancement under the DIA, the Indemnitee first must "submit to the Company a written request."[13] The DIA contains a non-exclusive forum provision in which the Company and the Indemnitee "consent to submit to the jurisdiction of the Delaware Court [of Chancery] for purposes of any action or proceeding arising out of or in connection with" the DIA.[14]

---

[10] Dkt. 607 ¶¶ 10-11.

[11] *See* Finger Aff. Ex. A §§ 3A (providing indemnification rights "by reason of Indemnitee's Corporate Status"), 8 (advancement) (Dkt. 1361). "Corporate Status" is defined, in relevant part, to include anyone "who is serving or has served . . . as a director of the Company." *Id.* § 1.

[12] *Id.* § 14A.

[13] *Id.* §§ 5, 9.

[14] *Id.* § 14N.

5

## C.    The Sale Order

On February 8, 2016, the Custodian submitted a proposed plan of sale for the Company that recommended holding a "modified auction."[15]  After the Custodian submitted his proposal, the parties engaged in briefing and a hearing was held to address Shawe's objections to the Custodian's recommendation.[16]

On July 18, 2016, the court entered an order implementing the Custodian's recommendation, with certain modifications (the "Sale Order").  Paragraph 14 of the Sale Order (i) reiterated the procedure set forth in paragraph 10 of the 2015 Order for the Custodian to petition the court on a monthly basis for approval of his fees and expenses, (ii) addressed the payment of fees and expenses of advisors, and (iii) added a new provision affording the Custodian the right to place some of the proceeds of a sale transaction into an escrow account to cover unpaid fees and expenses due to the Custodian and/or his advisors:

> The Custodian shall be compensated at the usual hourly rate he charges as a partner of the Firm.  The Custodian also shall be reimbursed for reasonable travel and other expenses incurred in the performance of his duties.  The Custodian shall petition the Court on a monthly basis, or such other interval as the Court may direct, for approval of fees and expenses.  Any fees and expenses approved by the Court shall be paid promptly by the Company.  The fees of any counsel or advisors retained by the Custodian (i) shall be determined pursuant to the applicable agreement entered into pursuant to Paragraph 7 hereof or (ii) shall be calculated on the same hourly rates charged by such counsel or advisors

---

[15] Dkt. 735.

[16] *In re TransPerfect Glob., Inc.*, 2016 WL 3477217.

6

to clients represented outside this matter. Such fees and expenses of such counsel or advisors shall be paid promptly by the Company upon approval of the Custodian. In the event any fees and expenses of the Custodian or any counsel or advisors retained by the Custodian or by the Company at the Custodian's direction remain unpaid at the closing of the Sale Transaction (or any claims for indemnification or advancement remain outstanding), the Custodian may provide for the proceeds of the sale to be paid into an escrow account and for the unpaid fees and expenses (and any claims for indemnification or advancement) to be deducted from the proceeds, and then for the proceeds to be distributed pro rata to the Company's stockholders.[17]

Although Shawe submitted a competing form of order that contained extensive revisions from the implementing order that the Custodian had proposed, Shawe did not propose any revisions to paragraph 14 of the Sale Order.[18]

In addition to the provision in paragraph 14 governing compensation for the Custodian and his advisors, the Sale Order included a provision governing judicial immunity, indemnification, and advancement similar to the one in the 2015 Order.[19]

---

[17] Dkt. 848. Paragraph 15 of the Sale Order also provides that: "No party to the Actions [*i.e.*, C.A. Nos. 9700-CB and 10449-CB], and no other person acting or purporting to act as a director, stockholder, officer, employee or agent of the Company shall institute or prosecute any actions or proceedings in any forum other than this Court challenging any action, recommendation or decision by the Custodian." *Id.*

[18] *See* Dkt. 837 Ex. A, ¶ 14.

[19] *See* Dkt 848 ¶ 16.

7

On August 18, 2016, the court certified an interlocutory appeal of the August 2015 opinion, the 2015 Order, and the Sale Order.[20]  On February 13, 2017, the Delaware Supreme Court affirmed the August 2015 opinion and both orders.[21]

### D.  Consummation of the Sale

After the Supreme Court's affirmance of the Sale Order, the Custodian oversaw a sale process that involved multiple rounds of bidding and resulted in execution of a securities purchase agreement on November 19, 2017 (the "Sale Agreement").[22]  Pursuant to the Sale Agreement, Shawe acquired Elting's 50% of the Company for $385 million, subject to certain adjustments.[23]  The transaction closed on May 7, 2018.

The Sale Agreement set aside $5 million from the purchase price "as a non-exclusive source of funds for securing," among other things, "amounts payable to the Custodian or his advisors, including, without limitation, investment banking, legal and accounting fees and expenses for services performed prior to or after the Closing."[24]  The $5 million was placed into an escrow account called the "Custodian

---

[20] Dkt. 882.

[21] *Shawe v. Elting*, 157 A.3d 152 (Del. 2017).

[22] Dkt. 1185 Ann. C.

[23] For simplicity, this decision refers to Shawe as the buyer.  Technically, the buyer was PRS Capital LLC, a New York limited liability company of which Shawe was the sole and managing member. *See In re TransPerfect Global, Inc.*, 2018 WL 904160, at *12.

[24] Dkt. 1185 Ann. C § 2.2.  As permitted under paragraph 14 of the Sale Order, the Sale Agreement provided that "[a]ll Company Fees and Expenses that remain unpaid as

Escrow Account." Any funds remaining in the Custodian Escrow Account when it is terminated are to be distributed to Shawe and Elting "in equal amounts."[25]

Section 7.5 of the Sale Agreement requires Shawe to, among other things, "take all necessary actions to cause the Company and the Company Subsidiaries to continue to indemnify and hold harmless, to the fullest extent permitted by applicable Law, the Custodian and each of the Company's and Company Subsidiaries' present and former directors."[26] Section 12.18 of Sale Agreement provides that "the duties and responsibilities of all parties subject to the Sale Order and all other orders of the Court in Civil Action Nos. 9700-CB and 10449-CB shall remain in full force and effect in accordance with their terms."[27]

On December 21, 2017, Elting filed a lengthy objection to the proposed sale of her interest in the Company under the Sale Agreement.[28] On February 15, 2018, after briefing and argument, the court issued an opinion rejecting Elting's objections and accepting the Custodian's recommendation to approve the transaction embodied

obligations of the Company or the Company Subsidiaries at the Closing shall be paid . . . from the Custodian Escrow Amount with respect to the fees and expenses of the Custodian and his advisors." *Id.* § 2.5.

[25] Dkt. 1185 Ann. E § 2.2.

[26] *Id.* Ann. C § 7.5(a).

[27] *Id.* § 12.18.

[28] Dkt. 1219.

in the Sale Agreement.[29]  That same day, the court entered the Final Order approving

the Sale Agreement.

Similar to Section 12.18 of the Sale Agreement, quoted above, paragraph 8 of

the Final Order provides for the continued validity of all orders entered in these

actions:

> The rights and authority granted to the Custodian and the duties and responsibilities of all parties to the Actions under the Sale Order and all other orders of the Court in Civil Action Nos. 9700-CB and 10449-CB shall remain in full force and effect in accordance with their terms until otherwise modified or discharged by the Court.[30]

Most significantly for purposes of the Custodian's contempt motion, paragraph 10

of the Final Order provides that the court has exclusive jurisdiction over the parties

to the actions "for all matters relating to the Actions:"

> Without impacting the finality of this Order and judgment, the Court retains continuing and exclusive jurisdiction over the parties to the Actions for all matters relating to the Actions, including the administration, interpretation, effectuation or enforcement of the Sale Agreement and the Related Agreements, and all orders of the Court in Civil Action Nos. 9700-CB and 10449-CB, and further retains and reserves continuing jurisdiction to consider any applications that the Custodian may make for the Court's assistance in addressing any problems encountered by the Custodian in performing his duties under any order of the Court.[31]

---

[29] *See In re TransPerfect Glob., Inc.*, 2018 WL 904160.

[30] Dkt. 1243 ¶ 8.

[31] *Id.* ¶ 10.

10

Finally, similar to the 2015 Order and the Sale Order, the Final Order includes a provision governing judicial immunity, indemnification, and advancement. Specifically, paragraph 7 of the Final Order states, in relevant part, that:

> Without limitation, the Custodian and Skadden, Arps, Slate, Meagher & Flom LLP (and its partners and employees) are entitled to judicial immunity and to be indemnified by the Company (or its successor in interest), in each case, to the fullest extent permitted by Law. Without limiting the generality of the foregoing and notwithstanding anything that could be construed to the contrary in this Order or the Sale Agreement, fees and expenses incurred by the Custodian or Skadden, Arps, Slate, Meagher & Flom LLP (and its partners and employees) in defending or prosecuting any civil, criminal, administrative or investigative claim, action, suit or proceeding reasonably related to the Custodian's responsibilities under the Sale Order or this Order, shall be paid by the Company (or its successor in interest) in advance of the final disposition of such claim, action, suit or proceeding, within 15 days of receipt of a statement thereof.[32]

On May 3, 2018, the Delaware Supreme Court affirmed the Final Order.[33] On May 7, 2018, the sale transaction was consummated, which resulted in Shawe becoming the 99% owner of the Company and his mother, Shirley Shawe, owning the remaining 1%.[34]

### E. Fee Petitions from May 2018 to April 2019

On May 10, 2018, the Custodian filed his monthly report in which he informed the court that he had resigned as a director of the Company but would continue to

---

[32] Dkt. 1243 ¶ 7.

[33] *Elting v. Shawe*, 185 A.3d 694 (Del. 2018) (TABLE).

[34] Dkt. 1185 Ann. D, Ex A, at A-1.

serve as Custodian for other purposes, with the expectation of filing a proposed order of discharge at a later date.[35] In the same letter, the Custodian petitioned the court under compensation provisions in paragraphs 10 and 11 of the 2015 Order to approve the fees and expenses he and his advisors had incurred and to require that they be paid by the Company.[36] The Custodian also advised the court of his intention to petition the court in the future for payment of his fees and expenses from the Custodian Escrow Account:

> In connection with the Closing, and pursuant to the terms of the Securities Purchase Agreement, an escrow account was established and funded to serve as a non-exclusive source of funds to pay my fees and expenses and the fees and expenses of my agents and representatives after May 7, 2018. I intend to continue to petition the Court for approval of my fees and expenses before seeking any release of funds from the escrow in relation thereto.[37]

From June 2018 to April 2019, the Custodian's monthly petitions for approval of fees and expenses explained that they would be paid from the Custodian Escrow

---

[35] Dkt. 1261 at 2.

[36] *Id.* at 3. For the time period from entry of the 2015 Order until the May 2018 petition, each of the petitions seeking approval for the payment of compensation to the Custodian and his advisors referenced paragraphs 10 and 11 of the 2015 Order. *See* Dkts. 640; 663; 689; 711; 733; 762; 791; 813; 817; 829; 863; 887; 909; 919; 921; 923; 934; 967; 980; 985; 997; 1005; 1008; 1019; 1026; 1111; 1199; 1224; 1239; 1255; 1257; 1261. As explained above, paragraph 14 of the Sale Order sets forth similar procedures to those in paragraphs 10 and 11 of the 2015 Order.

[37] Dkt. 1261 at 3-4.

Account.[38]  In his January 2019 report, the Custodian informed the court and the parties that he had fully retired from Skadden as of December 31, 2018, and that future services he would be providing as Custodian would be charged at a reduced hourly rate of $950 per hour.[39]

### F.    The May 2019 Fee Petition

On May 8, 2019 the Custodian submitted his monthly report and petition for approval of fees and expenses.[40]  In his May 2019 report, the Custodian advised the court and the parties that he expected his expenses would likely be higher in the coming months due two lawsuits involving TPG and Shawe:  (i) an action Cypress Partners LLC had filed against Shawe in New York state court (the "Cypress action") and (ii) an action TransPerfect had filed against Lionbridge Technologies, Inc. and H.I.G. Middle Market LLC in the United States District Court for the Southern District of New York (the "Lionbridge action").

According to the complaint in the Cypress action, Cypress had provided financial advisory services to Shawe in connection with the sale of the Company but Shawe refused to pay Cypress $800,000 plus expenses that allegedly were owed

---

[38] Dkts. 1267; 1269; 1271; 1273; 1275; 1277; 1279; 1281 Ex. 1; 1292 Ex. 1; 1303 Ex. 1; 1311 Ex. 1.

[39] Dkt. 1281 Ex. 1.

[40] Dkt. 1315 Ex. 1.

under its engagement agreement with Shawe.[41]  The Custodian explained in his May 2019 report that he had been informed that discovery, including a deposition, would be sought from him in connection with the Cypress action.[42]

H.I.G., which held a majority interest in Lionbridge, was one of the three final bidders for the Company during the sale process. [43]  In the Lionbridge action, which was filed on April 11, 2019, the Company is seeking "in excess of $300,000,000" against H.I.G. and Lionbridge for allegedly acquiring the Company's trade secrets and confidential information during the sale process and using its trade secrets to compete unfairly with the Company.[44]  On April 25, 2019, the Custodian and several Skadden attorneys received individual litigation hold notices relating to the Lionbridge action that seek, among other documents, "all records relating to the forced sale of TPG through an auction contest."[45]

In his May 2019 report, the Custodian explained that given the nature of the Cypress and Lionbridge actions, he intended in the future to seek payment for expenses incurred in connection with these actions *under the court's orders*, instead of using the Custodian Escrow Account for that purpose:

---

[41] *Id.* at Attachment A ¶¶ 1-6.

[42] *Id.* at 3.

[43] *In re TransPerfect Glob., Inc.*, 2018 WL 904160 at *9-12.

[44] Dkt. 1315 Ex. B, at 1 (¶ 1), 43 (¶ h).

[45] *Id.* at 8-10; Dkt. 1315 Ex. E, at 1.

Given the circumstances, as well as the nature of the Southern District Complaint and the Cypress Complaint, and the scope of the Litigation Hold Notices relating to the Southern District Action, I anticipate expenses to be higher in future months and, in future applications, I intend to seek prompt payment, *per Court order*, directly from TransPerfect Global, Inc. for these expenses, while reserving all rights vis-a-vis the Escrow Fund, which is a 'non-exclusive source of funds' to pay my fees and expenses and the fees and expenses of my agents and representatives post-Closing (funded 50/50 by Mr. Shawe and Ms. Elting).[46]

In a footnote, the report cited three provisions from prior court orders as support for seeking payment from the Company for time and expenses incurred in connection with the Cypress and Lionbridge actions: the indemnification provisions in (i) paragraph 7 of the Final Order and (ii) paragraph 16 of the Sale Order, and the (iii) compensation provision in paragraph 14 of the Sale Order.[47]

The May 2019 report sought approval to pay from the Custodian Escrow Account $60,104.70 in unbilled fees and expenses, which included $25,784.70 of Skadden's fees and expenses and $30,900 of Ernst & Young's fees and expenses "related to their work on pre-Closing tax periods."[48] On May 17, 2019, having heard no objection from any party, the court entered an order approving this request (the "May 2019 Order").[49]

---

[46] *Id.* at 10-11 (emphasis added) (citations omitted).

[47] *Id.* at 10-11 n.7. Footnote 7 also references Section 7.5 of the Sale Agreement.

[48] *Id.* at 11-12.

[49] Dkt. 1318.

## G. The June and July 2019 Fee Petitions

On June 17, 2019, the Custodian filed his monthly report and fee petition, seeking court approval concerning $58,767.71 in fees and expenses he had incurred that "primarily related to the two new lawsuits referred to in the May 8th Report," *i.e.*, the Cypress and Lionbridge actions.[50] Referencing the explanation provided in his May report, the Custodian requested that these expenses "be paid directly by Transperfect Global, Inc., rather than from the Escrow Fund."[51] On June 28, 2019, having heard no objection from any party, the court entered an order approving this request (the "June 2019 Order").[52]

On July 10, 2019, the Custodian filed his monthly report and fee petition, seeking court approval concerning $90,089.14 of unbilled fees and expenses, "of which $83,653 was incurred by Ernst & Young LLP in connection with its preparation of certain preclosing tax information."[53] Referencing the positions taken in his May and June reports, the Custodian requested "that the amounts billed by Ernst & Young LLP should be paid from the Escrow Fund, and the balance of $6,436.14 should be paid directly by TPG."[54] On July 17, 2019, having heard no

---

[50] Dkt. 1324 Ex. 1, at 2.

[51] *Id.*

[52] Dkt. 1327.

[53] Dkt. 1329 Ex. 1, at 2.

[54] *Id.*

objection from any party, the court entered an order approving this request (the "July 2019 Order").[55]

### H. The Nevada Action

On August 13, 2019, TransPerfect sued the Custodian in Nevada state court, asserting claims for breach of fiduciary duty and declaratory relief.[56] In a section entitled "The Indemnification Provisions in the Delaware Orders," the Nevada complaint specifically discusses in detail the indemnification provisions in the 2015 Order, the Sale Order, and the Final Order, and in the Sale Agreement.[57] In three other sections, the Nevada complaint discusses in detail the court's May 2019, June 2019, and July 2019 Orders.[58] Attached as exhibits to the Nevada complaint are copies of the 2015 Order, the Sale Order, the Fee Orders, and this court's opinions approving the 2015 and Sale Orders.[59]

The Nevada complaint seeks damages against Pincus concerning the $65,203.85 that the Company was ordered to pay him under the Fee Orders.[60] It also

---

[55] Dkt. 1331.

[56] In August 2018, the Company reincorporated in Nevada. Dkt. 1376 Ex. 1, ¶ 2.

[57] *Id.* ¶¶ 14-18.

[58] *Id.* ¶¶ 21-26 (May 2019 Order), 27-31 (June 2019 Order), 32-37 (July 2019 Order).

[59] *See* Voss. Aff. Ex. 4, at Exs. 1 (August 2015 opinion granting relief under 8 *Del. C.* § 226), 2 (2015 Order), 3 (Sale Order), 4 (July 2016 opinion approving the Sale Order), 5 (May 2019 report), 6 (May 2019 Order), 7 (June 2019 report), 8 (June 2019 Order), 9 (July 2019 report), 10 (July 2019 Order) (Dkt. 1337).

[60] *Id.* ¶¶ 46-50. The $65,203.85 amount is the sum of the amounts the Company was ordered to pay in the June 2019 Order ($58,767.71) and July 2019 Order ($6,436.14) for

17

seeks a declaration that the Company has no duty to indemnify the Custodian for this amount.[61]

## I. The August and September 2019 Fee Petitions

On August 20, 2019, the Custodian filed his monthly report and fee petition, seeking court approval concerning $3,941.97 of unbilled fees and expenses he and his counsel had incurred relating to work "on certain post-Closing tax and escrow matters," to "be paid from the Escrow Fund."[62] The Custodian also sought approval concerning $3,504.25 of unbilled fees and expenses he and his counsel had incurred for work related to the Cypress arbitration, to "be paid by the Company (for the reasons explained in [his] prior reports to the Court)."[63] Two days after the filing of the Custodian's August 2019 petition, Shawe's counsel informed the court that the petition was opposed.[64]

On September 25, 2019, the Custodian filed his monthly report and fee petition, seeking court approval concerning $39,102.46 of unbilled fees and expenses he and his counsel had incurred relating to work on post-closing tax matters

---

fees and expenses the Custodian incurred relating to the Cypress and Lionbridge actions. The Nevada action seeks no relief with respect to part of the July 2019 Order approving the payment of $83,653 from the Custodian Escrow Account for fees and expenses incurred by Ernst & Young.

[61] *Id.* ¶¶ 51-54.

[62] Dkt. 1334 Ex. 1, at 2.

[63] *Id.*

[64] *See* Dkt. 1338.

that "should be paid from the Escrow Fund."[65]  The Custodian also sought approval of $15,115.70 in unbilled fees and expenses he and his counsel had incurred for "work related to the Cypress arbitration and the letter demands" that "should be paid by the Company (for the reasons explained in [his] prior reports to the Court."[66]

On October 1, 2019, Respondents requested in a letter to the court "with regard to the September 25 Fee Petition and going forward, that when Petitions are filed (or even *before* they are filed), TPG and Shawe have a reasonable opportunity to review the basis for any amounts that the Custodian seeks to charge to TPG rather than the escrow account, by being provided with the billing records and supporting documentation, and then a reasonable period to submit objections."[67]

## J.  The Contempt Motion and Developments in the Nevada Action

On August 26, 2019, the Custodian filed its motion for contempt.  On September 18, 2019, after holding a scheduling conference on September 13, the court entered an order establishing a briefing schedule and scheduling a hearing on the contempt motion for October 10, 2019.[68]

On September 20, 2019, one week before its response to the contempt motion was due, the Company amended its complaint in the Nevada action to add a third

---

[65] *See* Dkt. 1335 Ex. 1, at 2.

[66] *Id.* at 3.

[67] Dkt. 1364.

[68] Dkt. 1349.

claim for specific performance under the DIA.[69]  The amended complaint does not allege that the Custodian ever submitted a written request under the DIA to trigger a demand for indemnification or advancement.  The amended complaint also clarified that the Company's declaratory judgment claim directly implicated the Sale Agreement and the Final Order:  "There is a genuine and bona fide dispute and an actual, justiciable controversy and disagreement between TPG and Pincus, who have adverse interests with regard to whether TPG has a duty to indemnify Pincus *under the SPA* [*i.e.*, Sale Agreement] *and Final Sale Order* [*i.e.*, Final Order] for the time expended in preparation as a third-party witness."[70]

On October 4, 2019, two hours after the Custodian filed his reply in further support of the contempt motion, TransPerfect filed a motion in the Nevada action requesting to file a forthcoming motion for summary judgment, which it filed the following Monday, on October 7, 2019.[71]  According to applicable Nevada rules of procedure, the Custodian is required to respond to the motion by October 17, 2019, and to file an answer to the complaint by October 18, 2019.[72]

---

[69] *See* Dkt. 1357; Finger Aff. Ex. E.

[70] Finger. Aff. Ex. E, ¶ 61 (emphasis added).

[71] *See* Dkt. 1371 at 2-3; Dkt. 1371 Ex. 1.

[72] Dkt. 1371 at 3; *See* Nev. R. Civ. P. 15(a)(3); Clark Cty. Nev. Loc. R. 2.20(e).  On October 16, the Custodian informed the court that, in response to an emergency motion to stay proceedings he had filed on October 11, the Nevada court granted a thirty-day stay of proceedings in the Nevada action.  Dkt. 1378.

20

## II. ANALYSIS

### A. Legal Standard

Court of Chancery Rule 70(b) expressly authorizes the Court to find a party in contempt for the party's "failure . . . to obey or to perform any order."[73] "The remedy of civil contempt serves two purposes: to coerce compliance with the order being violated, and to remedy injury suffered by other parties as a result of the contumacious behavior."[74] "To be held in contempt, a party must be bound by an order, have notice of it, and nevertheless violate it."[75] The "party petitioning for a finding of contempt bears the burden to show contempt by clear and convincing evidence."[76] "A cardinal requirement for any adjudication of contempt is that the order allegedly violated give clear notice of the conduct being proscribed."[77]

---

[73] Ch. Ct. R. 70(b).

[74] *Aveta Inc. v. Bengoa*, 986 A.2d 1166, 1181 (Del. Ch. 2009); *see also GMF ELCM Fund L.P. v. ELCM HCRE GP LLC*, 2019 WL 1501553, at *5 (Del. Ch. Apr. 4, 2019) (finding party in contempt for failing to comply with court's order to cooperate with court-appointed receiver); *Israel Disc. Bank of N.Y. v. First State Depository Co.*, 2012 WL 1021180, at *4 (Del. Ch. Mar. 19, 2012) (finding parties in contempt for violating a preliminary injunction order and noting that they had "acted in bad faith and vexatiously in negotiating and stipulating to" the preliminary injunction order and "apparently were never committed to complying" with it).

[75] *Aveta*, 986 A.2d at 1181.

[76] *Trascent Mgmt. Consulting, LLC v. Bouri*, 2018 WL 6338996 at *1 (Del. Ch. Dec. 04, 2018).

[77] *Mother African Union First Colored Methodist Protestant Church v. Conference of African Union First Colored Methodist Protestant Church*, 1992 WL 83518, at *9 (Del. Ch. Apr. 22, 1992), *aff'd mem.*, Del. Supr., 366 A.2d 369 (1993) (internal quotation omitted).

Whether a party should be held in contempt is a discretionary matter for the Court.[78] The violation "must not be a mere technical one, but must constitute a failure to obey the Court in a meaningful way."[79] Even where there has been a violation, the Court will consider good faith efforts to comply with the order or to remedy the consequences of non-compliance.[80] In a civil contempt proceeding, the "keys to the jail are in defendant's hands."[81]

## B. Shawe and TPG are in Contempt of the Final Order

The first two of the three elements necessary to find contempt of the Final Order plainly—and concededly—have been satisfied. Like all parties to these actions, Shawe and TransPerfect are bound by the Final Order. They also each had notice of the Final Order—which was docketed on February 15, 2018 and affirmed on May 3, 2018—long before the Nevada action was filed on August 13, 2019. Indeed, Shawe advocated for entry of the Final Order before the Delaware Supreme Court in 2018,[82] and TransPerfect specifically references the Final Order in the

---

[78] *Dickerson v. Castle,* 1991 WL 208467, at *3 (Del. Ch. Oct. 15, 1991).

[79] *Id.* at *4.

[80] *Id.*

[81] *Delaware State Bar Ass'n v. Alexander*, 386 A.2d 652, 665 (Del. 1978); *State v. Mancari*, 223 A.2d 81, 82 (Del. 1966).

[82] *See* Shawe Answering Br., No. 90, 2018, Dkt. 18.

Nevada complaint.[83]  Finally, Respondents have conceded that they are bound by the Final Order and that they had notice of it by not contending otherwise.[84]

In my opinion, the Custodian also has established by clear and convincing evidence that Shawe and TransPerfect violated paragraph 10 of the Final Order in a meaningful way.  To repeat, that provision states, in relevant part, that:

> Without impacting the finality of this Order and judgment, the Court retains continuing and exclusive jurisdiction over the parties to the Actions for all matters relating to the Actions, including the administration, interpretation, effectuation or enforcement of the Sale Agreement and Related Agreements, and all orders of the Court in Civil Action Nos. 9700-CB and 10449-CB.[85]

As previously mentioned, the complaint in the Nevada action specifically discusses in detail the indemnification provisions in the 2015 Order, the Sale Order, the Final Order, and the Sale Agreement, and this court's entry of the Fee Orders.[86]  Most significantly, the legal effect of various terms of these court orders and of the Sale Agreement are integral to adjudicating claims for relief in the Nevada action, in particular the claims for:  (i) damages against the Custodian for the amounts awarded to him under the Fee Orders (*i.e.*, $65,203.85) for work he performed

---

[83] *See* Voss Aff. Ex. 4, ¶ 16.

[84] *See* Shawe Opp'n ¶¶ 41-68 (Dkt. 1360); TPG Opp'n ¶¶ 30-60 (Dkt. 1359); *Emerald Partners v. Berlin*, 2003 WL 21003437, at *34 (Del Ch. Apr. 28, 2003) ("It is settled Delaware law that a party waives an argument by not including it in its brief.").

[85] Dkt. 1243 ¶ 10.  The Final Order defines the term "Actions" to mean Civil Action Nos. 9700-CB and 10449-CB.  *Id.* at 1 (third recital).

[86] Dkt. 1376 Ex. 1, ¶¶ 14-18, 31, 37.

concerning the Cypress and Lionbridge actions,[87] and (ii) a declaration that TransPerfect has no duty "to indemnify Pincus for the time expended in preparation as a third-party witness" in those actions.[88] As such, the filing of the Nevada action violated paragraph 10 of the Final Order by depriving the court of exclusive jurisdiction over the Respondents (as parties to these actions) for "matters relating to the Actions." The nature of the violation is evident in at least two ways.

First, the Nevada action specifically puts at issue—and thus deprives this court of exclusive jurisdiction over parties to these actions with respect to—the *interpretation* of the indemnification provisions in the 2015 Order, the Sale Order, the Final Order, and the Sale Agreement. This is because, in order to grant the declaratory relief sought in the Nevada action, the Nevada court would need to construe the indemnification provisions in three of this court's orders and in the Sale Agreement to determine whether the Custodian is entitled to be indemnified for work he has performed with respect to the Cypress and Lionbridge actions.

---

[87] *Id.* ¶ 49 ("Pincus breached his fiduciary duty by, among other things, seeking—*ex parte* in a sealed proceeding and without notice to TPG—indemnification from TPG for amounts presently unknown . . . but believed to be as much as $65,203.85 in fees for the time he personally spent preserving documents pursuant to a hold notice and producing documents in response to a subpoena").

[88] *Id.* ¶ 52 ("There is a genuine and bona fide dispute and an actual, justiciable controversy and disagreement between TPG and Pincus, who have adverse interests with regard to whether TPG has a duty to indemnify Pincus for the time expended in preparation as a third-party witness."). As explained above, the amended complaint in the Nevada action modified this allegation to expressly reference the Sale Agreement and Final Order. Finger Aff. Ex. E. ¶ 61.

24

Indeed, if the Nevada action proceeds beyond the pleadings stage, the interpretation of other provisions of this court's orders inevitably would be placed at issue in that action as well. In its May 2019 report, when explaining his intention to charge his time for the Cypress and Lionbridge actions to the Company rather than obtaining payment from the Custodian Escrow Account, the Custodian specifically relied on, among other provisions, the compensation provision in paragraph 14 of the Sale Order.[89] Thus, if the Nevada action continues beyond the pleadings stage, the Nevada court would need to construe Section 14 of the Sale Order—and the companion compensation provision in paragraph 10 of the 2015 Order—to determine if the Custodian is entitled to be compensated for work he performed in connection with the Cypress and Lionbridge actions.[90]

Second, the Nevada action specifically puts at issue—and thus deprives this court of exclusive jurisdiction over parties to these actions with respect to—*enforcement* of the Fee Orders. This is because, in order to award the damages and/or declaratory relief sought in the Nevada complaint, the Nevada court would have to consider the legal effect of the Fee Orders, which require that $65,203.85 be paid to the Custodian for work he performed concerning the Cypress and Lionbridge actions.

---

[89] Dkt. 1315 Ex. 1, at 10-11 n.7.

[90] *Id.*; *see also* Contempt Mot. ¶ 68 (citing 2015 Order ¶ 10; Sale Order ¶ 14).

Respondents argue that the claims in the Nevada action "are based on Pincus' status as a former director of TPG and are distinct from the Custodian's indemnification rights under the Final Order, so as to fall outside the four corners of the exclusive jurisdiction clause."[91] This argument is flawed in two respects.

First, as discussed above, Pincus' service as a tie-breaking director on the Company's board until a sale of the Company could be consummated was one of the purposes for which he was appointed as the Custodian in August 2015.[92] Thus, even assuming that Pincus' work on the Cypress and Lionbridge actions somehow relates to his role as a former TransPerfect director—a highly dubious assumption for the reasons discussed next—that role would fall within the scope of his rights to indemnification as the Custodian under this court's orders and the Sale Agreement. Those rights fall squarely within the four corners of the exclusive jurisdiction clause.

Second, as a factual matter, it appears specious for Respondents to contend that the Custodian's work with respect to the Cypress and Lionbridge actions related to Pincus' status as a former director of TransPerfect. More than three weeks before the Nevada action was filed, TransPerfect's General Counsel, Adam Mimeles, flatly admitted the opposite, *i.e.*, that "*Mr. Pincus has not been involved in the Cypress or*

---

[91] Shawe Opp'n ¶ 43.

[92] *See supra* I.A.

26

*Lionbridge litigation in his capacity as an officer or director of TransPerfect.*[93]

Consistent with Mimeles' admission, the Nevada complaint is devoid of any factual allegations demonstrating that the Custodian took any action relating to the events at issue in the Cypress or Lionbridge actions in his capacity as a director of the Company.[94] Indeed, the pleadings in those actions[95] and Shawe's own explanation of them in his opposition indicates that they both relate to the sale process the Custodian was appointed to oversee and not to his role as a tie-breaking director:

- "Cypress was retained along with another financial advisor to assist Shawe in obtaining financing for the proposed stalking horse transaction during the sale process" and is suing Shawe "for breach of contract for amounts allegedly owed by Shawe . . . under their engagement agreement."[96]

- "[The complaint in the Lionbridge action] details the improper action of Lionbridge and H.I.G. during and after the auction. To the extent that the Custodian is mentioned, it is largely for the purposes of explaining the auction procedure and the defendants' alleged abuse and manipulation of the auction process to gain unauthorized access to TPG's trade secrets and confidential information."[97]

---

[93] Voss. Aff. Ex. 4, at 2 (emphasis added).

[94] The absence of such allegations is not for a lack of access to information concerning the activities of the Company's board during the period when Pincus served as tie-breaking director as part of his custodial duties. Shawe was on the board this entire time.

[95] *See supra* I.F.

[96] Shawe Opp'n ¶¶ 21-22.

[97] *Id.* ¶¶ 25-26.

During last week's hearing, Shawe's counsel advanced a new argument that the record before the court is simply too "complex" to warrant a finding of contempt given the "multiple routes" the Custodian has identified as a basis to be paid for his time dealing with the Cypress and Lionbridge actions.[98] I disagree. Although it is true that the Custodian has identified multiple provisions from several of this court's orders and the Sale Agreement as non-exclusive sources of the Custodian's right to be paid for his time, and that those provisions may implicate interpretative issues, that is irrelevant to the contempt motion. What is relevant—and what the Custodian has shown clearly and convincingly—is that Respondents violated the plain terms of paragraph 10 of the Final Order by seeking to undermine this court's exclusive jurisdiction over parties to these actions to administer, interpret, effectuate, and enforce its own orders and the Sale Agreement by filing the Nevada action.

In seeking a finding of contempt, the movant is "not required to prove that the violation was willful or intentional."[99] "The intentional or willful nature of [the party's] acts may, however be considered in determining the appropriate

---

[98] Tr. 120-21 (Oct. 10, 2019).

[99] *Mother African Union First Colored Methodist Protestant Church v. Conference of African Union First Protestant Church*, 1995 WL 420003, at *10 (Del. Ch. July 13, 1995) (citing *Delaware Dept. of Serv. for Children, Youth and their Families v. Cedars Academy*, 1989 WL 134868, at *2 (Del. Ch. Oct. 30, 1989) (Allen, C.) citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949)).

sanction."[100]  Here, the record convinces me that the Respondents' violation of the Final Order has been intentional and willful.

To begin, the Nevada complaint characterizes the Custodian's actions with respect to the Cypress and Lionbridge actions as relating to Pincus' role as a former director of the Company rather than his role as the overseer of the sale process. Putting aside that this distinction is legally irrelevant to the applicability of the indemnification and compensation provisions in this court's orders, there is strong evidence, discussed above, that Respondents knew they were concocting a false narrative in portraying the Custodian's role in this manner.  Respondents did so in an apparent attempt to circumvent the exclusive jurisdiction provision in the Final Order, *i.e.*, by suggesting that the indemnification provisions in this court's orders would not apply to the Custodian's service as a director.

Respondents doubled-down on seeking to circumvent the exclusive jurisdiction provision after the Custodian filed the contempt motion (on August 26) and after the court held a teleconference (on September 13) to schedule a hearing on that motion—which was scheduled to be held on October 10.  Specifically, on September 20, TransPerfect amended its complaint in the Nevada action to assert a claim for breach of the DIA, which affords the Custodian certain rights to

---

[100] *Mother African*, 1995 WL 420003, at *10 n.9.

29

indemnification and advancement but only in his capacity as a director of TPG.[101] Significantly, as Respondents admit, one of the "conditions" for requesting indemnification or advancement under the DIA is that Pincus first must submit a written request.[102] No such written request has been made, however. In short, the Company amended its Nevada complaint in the face of the contempt motion in an effort to seize on the non-exclusive forum provision in the DIA, even though it knew that the DIA had not been invoked and that there was no ripe claim to assert for breach of the DIA.

Finally, on October 7, 2019, just three days before the scheduled hearing on the contempt motion in this court, TransPerfect filed a motion for partial summary judgment in the Nevada action. And, when asked by the Custodian to agree to an extension to respond to this motion and to file an answer until after the hearing on the contempt motion, the Company declined—intentionally forcing the Custodian and his counsel to spend additional time and resources on litigation filed in contempt of the exclusive jurisdiction provision in the Final Order.[103]

* * * * *

---

[101] *See supra.* I.B.

[102] Shawe Opp'n ¶ 14.

[103] Dkt. 1371 at 4; Dkt. 1373.

For the reasons explained above, the court concludes that the Custodian has established by clear and convincing evidence that the Respondents violated the Final Order in a meaningful way and did so intentionally and willfully. The court turns next to the appropriate sanction to remedy this violation.

## C. The Appropriate Sanction

"A trial judge has broad discretion to impose sanctions for failure to abide by its orders" but its "decision to impose sanctions must be just and reasonable."[104] Sanctions imposed "for civil contempt should be directed towards coercing compliance with the order being violated and remedying the injury suffered by other parties as a result of the contumacious behavior"[105] In selecting contempt sanctions, the court is "obligated to use the least possible power adequate to the end proposed."[106]

The Custodian seeks entry of an anti-suit injunction and an award of a *per diem* monetary sanction to coerce Respondents' compliance with the Final Order

---

[104] *Gallagher v. Long*, 940 A.2d 945, 2007 WL 3262150, at *2 (Del. 2007) (TABLE) (citing *Lehman Capital v. Lofland*, 906 A.2d 122, 131 (Del. 2006) (internal citations omitted)); *see also In re Rinehardt*, 575 A.2d 1079, 1082 (Del. 1990); *Rittenhouse Associates v. Frederic A. Potts & Co.*, 382 A.2d 235, 236 (Del. 1977).

[105] *Aveta*, 986 A.2d at 1188 (Del. Ch. 2009) (citing *Delaware State Bar Ass'n*, 386 A.2d at 665).

[106] *Id.* (citing *TR Investors, LLC v. Genger*, 2009 WL 4696062, at *18 n.74 (Del. Ch. Dec. 9, 2009)). *See also* Am. Jur. 2D *Contempt* § 195 ("Courts have the inherent power to enforce compliance with their lawful orders…[but]…[i]n selecting contempt sanctions, a court is obligated to use the least possible power adequate to the end proposed.").

and to secure dismissal of the Nevada action.[107]  He also asks the court to reaffirm, through a sanctions award, "TransPerfect's obligation to pay for the Custodian's fees and expenses (including those of his counsel, Skadden) incurred in addressing Shawe's and TransPerfect's contumacious behavior and in enforcing the Court's orders, including but limited to, litigating this motion and any costs related to seeking dismissal of the Nevada lawsuit."[108]  In my view, each of these measures is necessary to remedy Respondents' intentional and willful violation of the Final Order.

"[B]lack letter principles of law . . . recognize that an anti-suit injunction is appropriate '(1) to address a threat to the court's jurisdiction; (2) to prevent evasion of important public policy; (3) to prevent a multiplicity of suits; or (4) to protect a party from vexatious or harassing litigation.'"[109]  With respect to the first situation, this Court has enjoined the pursuit of litigation in other courts in order to protect its own jurisdiction, particularly where a filing is "a transparent effort [by a litigant] to remove the controversy to a forum of its own choosing."[110]

---

[107] Contempt Mot. ¶¶ 74-78.

[108] Contempt Mot. ¶ 79.

[109] *In re Liquidation of Freestone Ins. Co.*, 143 A.3d 1234, 1249 (Del. Ch. 2016) (quoting 43A C.J.S. *Injunctions* § 103 (2016)).

[110] *Ivanhoe Partners v. Newmont Mining Corp.*, 1988 WL 34526, at *6 (Del. Ch. Apr. 7, 1988); *see also State v. Indem. Ins. Corp, RRG*, C.A. No. 8601-VCL, ¶ 9 (Nov. 1, 2013) (ORDER) (restraining and enjoining individual "and any entity he controls . . . from filing

In *Carlyle Investment Management LLC v. National Industries Group (Holding)*, then-Vice Chancellor Strine "permanently enjoined" a party "'from filing or prosecuting any action'" that would be subject to a controlling forum selection clause "'in any forum other than the courts of the State of Delaware.'"[111] Similarly, in *Household International, Inc. v. Eljer Industries, Inc.*, Chancellor Allen entered an anti-suit injunction prohibiting defendants "and all persons in active concert or participation with any of them" from "commencing or prosecuting any litigation in any court other than the Superior Court of the State of Delaware" related to the subject matter of litigation currently pending in the Superior Court, "including . . . the action pending in the District Court of Dallas County, Texas."[112]

Here, the presence of the exclusive jurisdiction provision in paragraph 10 of the Final Order did not prevent Shawe and TPG from filing and continuing to press—even after the filing of a contempt motion—a lawsuit outside of this court in an intentional and willful attempt to circumvent the court's exclusive jurisdiction over Respondents with respect to the interpretation and enforcement of the court's own orders and the terms of the Sale Agreement. Accordingly, entry of an anti-suit

---

any actions in any jurisdiction against Indemnity or any of its officers, agents, employees, or directors without leave of this Court").

[111] 2012 WL 4847089, at *3, *4 (Del. Ch. Oct. 11, 2012) (citation omitted), *aff'd*, 67 A.3d 373 (Del. 2013).

[112] 1995 WL 405741, at *3 (Del. Ch. June 19, 1995); *see also Aveta*, 986 A.2d at 1190 (describing scope of anti-suit injunction).

injunction and a *per diem* monetary sanction is necessary and warranted to coerce dismissal of the Nevada action and compliance with the Final Order.

The Custodian cites authorities in which this court has imposed fines of $10,000 to $20,000 per day to coerce compliance with its orders based on consideration of an individual's net worth[113] and the size of a transaction.[114] Respondents declined to address the Custodian's request for a monetary sanction, and provided no comment on the amount that would be appropriate if one were awarded.

The amount of a *per diem* monetary sanction must be sufficient to motivate the Company to promptly cure its failure to comply with the Final Order.[115] With this in mind, and having considered prior precedents, the court will impose a civil fine in the amount of $30,000 per day. When one considers that the sales process elicited bids for the Company with implied enterprise values and net purchase prices exceeding $750 million,[116] this amount is on the modest side in my view. The implementing order will include a grace period such that no fine will be incurred if

---

[113] *In re Rehab. of Indem. Ins. Corp., RRG*, 2014 WL 31710, at *8 (Del. Ch. Jan. 2 2014) (imposing $10,000 per day sanction until party complies with a seizure order after taking into account defendant's personal net worth).

[114] *Aveta*, 986 A.2d at 1188 (imposing $20,000 per day sanction for every day beyond 30 days that defendant failed to arbitrate his claims per court order, which was "on the light side" given the "context of an over $157 million deal").

[115] *See Israel Disc. Bank of N.Y.*, 2012 WL 1021180, at *3.

[116] *See In re TransPerfect Glob., Inc.*, 2018 WL 904160, at *12.

34

the Nevada action is dismissed by Monday, October 21, 2019. If the Nevada action is not dismissed within ten calendar days thereafter, the court would entertain a motion to increase the amount of the monetary sanction.

Finally, the court will order that Respondents bear all of the expenses, including reasonable attorneys' fees, that the Custodian has incurred because of the Respondents' contempt.[117] This sanction includes all the expenses the Custodian and his counsel have incurred in defending the Nevada action and in connection with the prosecution of the contempt motion. Awarding this sanction is particularly appropriate given the intentional and willful nature of the contempt violation, including Respondents' insistence on pressing its prosecution of the Nevada action in the face of the contempt proceedings. The court will award the payment of these expenses as a sanction, without regard to whatever rights the Custodian has to recover these amounts under this court's orders and/or the Sale Agreement.

## III. CONCLUSION

For the reasons explained above, the Custodian's motion for civil contempt and an award of sanctions is granted with respect to the Final Order. An implementing order accompanies this decision.

---

[117] *See Aveta*, 986 A.2d at 1188 (ordering contemptor to "bear all expenses, including attorneys' fees, that [the movant] has incurred because of [the contemptor's] contempt).